[Crim. No. 5780. In Bank. Jan. 29, 1957.]

THE PEOPLE, Respondent, v. OSCAR HUGO BRUST, Appellant.

Eugene V. McPherson for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant has been found guilty of the first degree murders of his estranged wife and his stepson. The jury had been instructed that "if you should fix the penalty as death, you will not specify the death penalty in the verdict, and you will say nothing about punishment in the verdict"; so instructed, they returned verdicts silent as to penalty. Defendant was also convicted of assault upon his stepdaughter with a deadly weapon with intent to commit murder. Jury trial on his plea of not guilty by reason of insanity was waived and the court found that defendant was sane at the time of the commission of the offenses. Defendant's motion for new trial was denied. This appeal from the judgment imposing the death sentence for each murder is taken by virtue of section 1239 (par. (b)) of the Penal Code.

Defendant's contentions relate only to the trial of the issues raised by his plea of not guilty. He argues that the evidence before the jury was insufficient to show that the murders were willful, deliberate, and premeditated (the only theory upon which they could have been found to be of the first degree). Defendant also complains of the trial judge's rejection of evidence of declarations by defendant's wife; this evidence, defendant claims, should have been admitted on the issue of the wife's provocation of defendant. We have concluded that defendant's contentions are without substantial merit. We have further concluded that the use of the so-called "silent verdict," in the circumstances of this case which are hereinafter delineated, is not shown to have misled the jury as to the unlimited scope of their discretion in choice of penalty for the murders or affected adversely to defendant their sense of responsibility for such choice of penalty.

At about 4 a.m. on October 30, 1954, defendant fatally shot his wife, Mildred Brust, and his stepson, Curtis Johnson, aged 16, and shot and wounded his stepdaughter, Kay Marie Johnson, aged 14. The shootings were the culmination of long-continued domestic difficulties. Defendant and Mildred were married in 1947. Curtis and Kay Marie, the children of a previous marriage of Mrs. Brust, lived with the Brusts. Defendant and Mrs. Brust had one child, Bobby, who was 5 years old at the time of the killings. Mr. and Mrs. Brust

argued frequently about the stepchildren's lack of respect for defendant, defendant's authority in the home, and finances. On July 12, 1954, Mrs. Brust began an action for divorce and defendant moved from the family home. According to defendant he was "illegally evicted"; in fact the complaint was accompanied by a request for an order that defendant be restrained from occupying the community home. Mr. and Mrs. Brust entered into a property settlement agreement which defendant performed, but Mrs. Brust repeatedly asked defendant for additional money. An interlocutory decree was entered on October 1, 1954. Mrs. Brust was awarded custody of Bobby with rights of visitation to defendant.

Defendant was employed by the federal government as a letter carrier. After the divorce proceeding was instituted, and at a time at least two weeks before the commission of the offenses of which defendant stands convicted, he surreptitiously took from the post office a key to the portion of the office where guns and ammunition were kept and had a locksmith make a duplicate of the key; he did this so that he would be able to obtain a gun. (*Cf. People* v. *Green* (1932), 217 Cal. 176, 179 [17 P.2d 730].)

At about 10 p.m. on October 29, 1954, defendant, at Mrs. Brust's request, telephoned her. She asked defendant to care for Bobby the next day, Saturday; defendant refused; and they argued. Defendant then went to the Brust house (defendant testified that Mrs. Brust asked him to come; Kay Marie testified that she did not). Defendant and Mrs. Brust quarreled, first about defendant taking Bobby, then about other matters. Mrs. Brust said, "I am going to make trouble for you" with defendant's employer and the sheriff, and became very angry, "going into a tantrum." Defendant seized her arms and shook her and they fell to the floor. Kay Marie came toward them and defendant slapped her. Defendant said, "I want to get out of here," and Mrs. Brust said, "Call the police. . . . I have got him where I want him." Defendant attempted unsuccessfully to pull the telephone from the wall and left.

Defendant drove about "in a turmoil" and thought of committing suicide. He went for a time to the Elks Club. He drove to the post office, used his duplicate key, and took a revolver loaded with six cartridges. He returned to his room for a time.

After further driving about, defendant went to the Brust home at about 4 a.m. He broke open the front door, on which

there was a chain lock. Mrs. Brust came from her bedroom and defendant shot her; the wound severed an artery. Kay Marie was screaming and running about her room; defendant fired two shots into the room and wounded her in the arm and shoulder. He went into Curtis' room, where the boy was attempting to shield himself beneath the covers, and shot him fatally in the back of the head. Meanwhile, Kay Marie had gone to the telephone and told the operator to send the police.

After defendant shot Curtis he telephoned his adult daughter and told her that he had "wiped out the family" and was going to kill himself and that he wanted her to come and get Bobby.

Deputy sheriffs arrived at the Brust residence at 4:50 a.m. Kay Marie met them at the door. When they entered the living room where defendant was, defendant put the revolver to his head and pulled the trigger repeatedly but the gun did not fire. A deputy seized defendant's arm and defendant, at the deputy's command, dropped the gun.

The revolver contained four empty cartridges and two loaded cartridges with indentations on the primer caps which indicated that they had misfired.

Defendant, who appeared "very calm," answered the questions of the deputies. He said, among other things, "I shot my wife first, and then my stepdaughter twice, and then my stepson. I wish you guys hadn't stopped me. I wanted to save the State the money. . . . I planned this for two months. . . . I got the gun from the post office . . . I had a key made to get in with. It was part of the plan." Asked, "Aren't you sorry you have done this?" defendant replied, "No; I am glad. They have ruined my life, and it is too late to start over again. I am getting too old."

In subsequent voluntary statements made by defendant to officials on October 30 and November 1, defendant described his domestic difficulties and the shootings. He said, among other things, that he had the duplicate post office key made "For this definite reason. . . . What I have done" and that he took the gun "For the exact purpose that I used it for—to kill my wife and her two children and also myself"; that "I had planned somewhat to destroy the family, except my son, including myself," from the time defendant was "evicted from the home" on July 12; and that if his victims were alive he would do the same thing "Probably sooner."

█ As the foregoing summary of the evidence shows, there is legally adequate proof of willful, deliberate, and premedi-

tated murder. Defendant's argument that the evidence establishes no more than second degree murder[1] is based on a view of the evidence favorable to defendant rather than to the state. He urges that there was provocation ''adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving . . . [each] homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation'' (*People* v. *Thomas* (1945), *supra*, 25 Cal.2d 880, 903). Defendant's argument is particularly directed to the killing of Mrs. Brust, but he also refers to provocatory conduct of the stepchildren during the time he lived with them (their disrespect for defendant, making faces at him, calling him a ''bald-headed old goat,'' demanding toys which he could not afford). The jury (who were fairly instructed as to the differences between the degrees of murder) could have accepted, but were not compelled to favor, the view that conduct of the victims was so grossly provocatory as to negative or raise a reasonable doubt as to the formation of a truly deliberate intent to kill; the jury's determination in this respect is controlling on appeal.

Defendant argues that because he had the key to the post office and could have obtained the gun prior to his going to the Brust home on the night of October 29, but did not up to that time avail himself of his opportunities to kill his wife and stepchildren, it is apparent that he had abandoned any intent to kill which he may have had previously; that after he went to the Brust home on October 29 at about 10:15 p. m. he could not have formed a deliberate intent to kill because the circumstances of his quarrel with Mrs. Brust, ''coupled with the indignities heaped upon him by his wife and stepchildren,'' precluded subsequent dispassionate deliberation. Defendant particularly relies upon his own testimony that during his quarrel with Mrs. Brust ''She asked me for about $50.00. She said she could show me a good time''; that thereafter when they fell to the floor defendant dislocated his shoulder; and that during the approximately five hours after he left the Brust home on the night of October 29 and before he returned on the morning of October 30 he was

---

[1] Murders of the first degree and of the second degree are defined and distinguished in *People* v. *Bender* (1945), 27 Cal.2d 164, 181 [16]-185 [21] [163 P. 8]; see also *People* v. *Thomas* (1945), 25 Cal.2d 880, 903 [156 P.2d 7].

planning suicide, not murder, but wished to see Bobby before he killed himself.

While the jury could have accepted any or all of the views of the evidence urged by defendant it is clear that they were not required so to do. In this connection it may be noted that there is testimony that defendant first complained of the shoulder injury in the county jail on November 1, and that he stated that it occurred when he rolled over on his bunk in the jail.

Defendant complains of the rejection of his offer of proof of statements of Mrs. Brust, made to persons other than defendant, which he says were relevant to the issue of provocation sufficient to establish that the killing of Mrs. Brust (and, impliedly, of Curtis) was no more than murder of the second degree. The rejected evidence was as follows: (1) Seven months before she was killed Mrs. Brust stated, "Some day he [defendant] is going to make me so mad that I will kill him." (2) Four months before she was killed, while the Brusts were in Montana, Mrs. Brust said that "she hated Mr. Brust and didn't know whether she was going back to California with him." (3) On the afternoon before she was killed she stated that she was going to "get in touch with Mr. Brust and get some more money out of him." This evidence, defendant says, was admissible because it tends to show that Mrs. Brust "was in fact a person who would provoke appellant."

An important theory of the defense is that a long-continued, provocatory course of conduct of Mrs. Brust culminated in bringing defendant to a point where his capacity for cool deliberation was substantially impaired. Declarations (1) and (2) quoted in the last paragraph are relevant to this theory for the following reasons: The victim's expressions of hostility to defendant tend to show the existence of hostility. The existence of hostility tends to show the probability of hostile conduct toward defendant. Evidence of circumstances which would tend to excite defendant's anger against his victim may be admitted on defendant's behalf as tending to show provocation and passion, and therefore excusability or a lesser degree or lower class of crime. (See Pen. Code, §§ 195, par. 2, 192, par. 1; *People* v. *Valentine* (1946), 28 Cal.2d 121, 132 [4], 137, 143 [169 P.2d 1]; II Wigmore, Evidence (3d ed., 1940), § 390, p. 338.) Declaration (3) quoted in the last paragraph is also relevant, for it is a declaration of the victim's intent to behave provocatively

toward defendant. (See *People* v. *Weatherford* (1945), 27 Cal.2d 401, 421-423 [164 P.2d 753]; *People* v. *Alcalde* (1944), 24 Cal.2d 177, 185-188 [148 P.2d 627].)

The declarations are not vulnerable to the hearsay objection. The defense sought to use declaration (1) not as proof of the truth of its contents (hearsay) but as circumstantial evidence of Mrs. Brust's hostile feeling toward defendant. (See *People* v. *Radley* (1945), 68 Cal.App.2d 607, 609 [157 P.2d 426].) Declaration (2) has a dual aspect: as hearsay evidence that Mrs. Brust, as she declared, "hated Mr. Brust," and as circumstantial evidence of her hostility. Declaration (3) is hearsay evidence of the existence of the declared intent.

Insofar as the evidence is hearsay, the following analysis (*People* v. *Weatherford* (1945), *supra,* 27 Cal.2d 401, 421) is pertinent: "it is admissible only if there appears to be a necessity for that type of evidence and a circumstantial probability of its trustworthiness (V Wigmore, p. 202, § 1420), and if it falls within an accepted exception to the hearsay rule. . . . The death of the declarant creates the necessity for resort to hearsay and the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of trustworthiness. (VI Wigmore, § 1725, p. 80.)" Even when it is not strictly *necessary,* because of death or unavailability of the declarant, to receive declarations of existing mental or emotional state, such declarations can be received "on the consideration that, though the person's testimony on the stand may still be both actually and conveniently practicable, yet the probability of there receiving from him testimony which shall be in value equal or superior to certain hearsay statements is small; thus, while there is hardly a necessity in the strict sense, there is at least a desirability of resorting also to the hearsay statements." (VI Wigmore, Evidence (3d ed., 1940), § 1714, p. 58.)

Although the above discussion presents theories under which the declarations might have been received in evidence, defendant has not shown that their exclusion was prejudicial. Defendant testified at great length to provocatory conduct of Mrs. Brust, including her attempts to "get . . . money out of him." Other witnesses testified that they had heard both Mr. and Mrs. Brust, together and separately, discuss and complain about their marital difficulties, and had observed them quarreling. In view of the large amount of evidence

received as to hostile feelings and provocatory conduct of Mrs. Brust, it does not appear that the admission in evidence of the three specific declarations quoted above would have led the jury to give more effect than they did to defendant's contention that the murder was of the second degree.

The prosecuting attorney, on *voir dire* examination of the prospective jurors, made the following accurate and candid statement as to responsibility for choice of penalty in the event the jury should find defendant guilty of first degree murder: "Let's assume this situation . . . You have heard all of the evidence. . . . You heard the instructions and you retire and deliberate. You and your fellow jurors come to the conclusion that one or both of these murders alleged here are first degree murder. That is your conclusion beyond a reasonable doubt. Then it becomes your duty which you undertake, your responsibility—a responsibility that you can't shirk off on me and you can't shirk off on Mr. McPherson [defendant's counsel] and you can't shirk off on the judge— to decide what the penalty will be." That forthright statement of the prosecutor becomes of substantial significance in a record which otherwise might present a serious problem as to the fairness of the trial on the issue of penalty.

 During the *voir dire* examination of prospective jurors the prosecuting attorney made eight references materially similar to the following: "In your examination of the evidence for that factor [choice of penalty, assuming that the jury have concluded that the killing was murder of the first degree], *you find no reason* in your sound judgment, in your sound discretion *why you should extend to the defendant life imprisonment.* Under those circumstances, would you hesitate at all to return a verdict assessing the extreme penalty?" (Italics added.) And the prosecuting attorney made eleven references materially similar to the following: "You discuss the facts pro and con and re-examine them and in your judgment *you can't see any reason why you should extend to the defendant the leniency of life imprisonment.* Under those circumstances, would you hesitate at all to return a verdict . . . assessing the death penalty?" (Italics added.)

In argument concerning the selection of penalty the prosecuting attorney three times used the phrase "leniency of life imprisonment"; he said, "Is there one thing in the evidence that anyone of you can point your finger at and say that that serves in *mitigation* of the defendant's terrible deeds? It isn't there"; and he twice stated that there was nothing to "*mitigate* the murder" of Curtis. (Italics added.)

The statements of the prosecuting attorney summarized in the preceding two paragraphs, in the absence of other circumstances hereinafter delineated, might have suggested to the jury the erroneous concept that life imprisonment was a "leniency" to be extended only if the jury found "mitigation." Such a concept would be contrary to the law.

As emphasized in *People* v. *Green* (1956), *ante,* pp. 209, 218 [302 P.2d 307], "It is *not* a function of the jury either to *lighten* the punishment or to *increase* the punishment; they have no such power. The statute [Pen. Code, § 190, quoted *post,* p. 788, footnote 2] clearly and equally states two alternatives as punishment; it gives preference to neither. It is the function and responsibility of the jury to select, and to designate in their verdict, which of the two punishments prescribed by the statute shall be imposed in any given case," and it is not necessary that the choice of penalty be based on a finding of mitigating or of aggravating circumstances. As stated in *People* v. *Friend* (1957), *ante,* p. 759 [306 P.2d 463], "If a prosecutor is trying to persuade the jury to select the death penalty, it would seem more to the point and more consistent with the statute that he should place the greater emphasis of his argument on developing *aggravating* circumstances rather than the mere absence of *mitigating* factors."

Upon consideration of all the pertinent circumstances of the case, however, it does not appear reasonably probable that the jury, when the case was submitted to them, could have possessed the above mentioned erroneous concept of their duty. The judge, the prosecutor, and the defendant's counsel, during the *voir dire* examination of prospective jurors, repeatedly emphasized that the jury must follow the instructions of the judge rather than statements of counsel as to the law. The formal instructions of the judge began, "It becomes my duty as judge to instruct you concerning the law applicable to this case, and it is your duty as jurors to follow the law as I shall state it to you," and continued, "You are to be governed solely by the evidence introduced in this trial and the law as stated to you by me." Therefore, it is to be assumed that the jury followed the judge's instruction as to choice of penalty.

The sole instruction on that subject was as follows: "The law of this state provides that every person guilty of murder in the first degree shall suffer death or confinement

in the state prison for life, at the discretion of the jury that finds him guilty. If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty or confinement in the state prison for life. If you should fix the penalty as confinement in the state prison for life, you will so indicate in your verdict, using a form that will be handed to you when you retire to deliberate, but if you should fix the penalty as death, you will not specify the death penalty in the verdict, and you will say nothing about punishment in the verdict. In determining which penalty should be imposed, you should not act arbitrarily. Your decision should be based upon a sound discretion, after a thorough consideration of all the evidence in the case, and the law as given you by this Court as it may apply thereto. In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment.''

The foregoing instruction, insofar as it relates to the jury's discretion as to choice of penalty, does not transgress the following requirement (*People* v. *Friend* (1957), *supra, ante*, p. 766) : The jury ''may be told that the state is responsible for the law which defines murder of the first degree and which prescribes that every person guilty of such offense 'shall suffer death, or confinement in the state prison for life,' but in that event they must further be told that by the very terms of the statute the responsibility of making the selection as between death or imprisonment for life is committed absolutely to the jury.'' The instruction in its first sentence states the pertinent substance of section 190 of the Penal Code.[2] Neither the remainder of the instruction nor any other portion of the record before us (when the whole of that record is considered) can reasonably be said to have led the jury to the erroneous belief that they were not the sole arbiters when they reached the question of selection of punishment or that their discretion in that regard was not absolute.[3] The jury were told,

---

[2]Section 190 (as amended by Amendments to the Codes, 1873-1874, p. 457) provides, ''Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same . . .''

[3]As we have pointed out in *People* v. *Green* (1956), *supra, ante*, pp. 209, 218-219, 229-231, and emphasized in *People* v. *Friend* (1957), *supra, ante*, pp. 749, 764, this court as early as 1895 announced (in *People* v. *Leary*, 105 Cal. 486, 496 [39 P. 24]) that section 190 of the Penal Code (as amended by Amendments to the Codes, 1873-1874, p. 457) ''confided the power to affix the punishment within these two alternatives [death or life imprisonment] to the absolute discretion of the jury''; and since

"you are *entirely free* to act according to *your own* judgment" (italics added). They were not expressly and erroneously told, as were the jury in *People* v. *Green* (1956), *supra, ante,* pp. 217-218, that it was their duty to fix the penalty at death if they did not find extenuating facts or circumstances. They were not misled into the erroneous belief, as were the jury in *People* v. *Friend* (1957), *supra, ante,* p. 764, that they must find mitigating circumstances in order to justify return of a verdict which specified the punishment of life imprisonment rather than a verdict which by silence as to penalty indicated the death penalty. ▆▆▆ Also, there was no intimation by the court in this case that the prosecuting attorney's forthright statement as to the jury's responsibility for the selection of punishment (hereinabove quoted) was not accurate. To the contrary, although the court's instructions were not as specific as was the prosecutor's statement of responsibility, the effect of the instructions was to support the quoted statement. Hence, the use of the silent verdict here could not have contributed to error in that respect.

▆▆▆ The instruction that the jury in determining penalty "should not act arbitrarily" does not suggest that the law favors the death penalty or that the jury would act "arbitrarily" if they fixed the penalty as imprisonment for life in the absence of mitigating circumstances; neither does it suggest that the law favors life imprisonment or that they would act "arbitrarily" if they fixed the penalty as death in the absence of aggravating circumstances.

▆▆▆ The instruction that the jury's decision as to penalty "should be based upon a sound discretion, after a thorough consideration of all the evidence in the case, and the law as given you by this Court as it may apply thereto," is correct in the circumstances of this case, where determination of the effect of "the evidence" and "the law" on selection of penalty was left to the jury alone.[4] It should be noted, however,

---

this is the clear meaning of the statute it is obvious that the jury must not be misled into believing that any rule of law or state of facts restricts them in their selection of punishment, or that the law or the judge favors either penalty over the other.

[4] "The jurors should understand that it is their duty to conscientiously consider all the evidence in the case in arriving at their decision but that it is not essential to their choice of either penalty that they find palliating or mitigating circumstances on the one hand or evidence in aggravation of the offense on the other hand; that insofar as selecting the penalty is concerned (as between the two alternatives) the law does not itself prescribe, nor authorize the court to innovate, any rule circumscribing the exercise of their discretion, but, rather, commits the whole matter of

that such an instruction could gravely mislead a jury if "the law as given you by this Court" suggested that one penalty or the other should be preferred either as a general rule of law or on the facts of the case.

██ Here, as has been mentioned above, the jury were told (as they were in *People* v. *Friend* (1957), *supra*) that "if you should fix the penalty as death, you will not specify the death penalty in the verdict, and you will say nothing about punishment in the verdict." The giving of the foregoing instruction, followed by the return of forms of verdict silent as to the penalty for the first degree murders, was not in itself error, and, as we have above shown, did not in the circumstances of this case contribute to misleading the jurors as to the character and extent of their responsibility in the selection of penalty. ██ The use of the "silent verdict," however, is undesirable for the reasons stated in the Friend case (1957), *supra, ante,* pp. 749, 772. The practice grew out of grave error (in *People* v. *Welch* (1874), 49 Cal. 174, 185) expressly pointed out and denounced in the Green case (1956), *supra, ante,* pp. 224, 231, 232; it may tend to make the jury feel less than their full responsibility for selection of the death penalty; and it may, combined with error relating to selection of penalty, contribute to reversal and retrial on the question of punishment. The "silent verdicts" here, nevertheless, appear to have been returned by a jury who, as disclosed above, were not misled as to the nature and scope of their duty or power or responsibility in fixing the penalty. We conclude, therefore, that the use of such forms of verdict does not, either alone or in combination with the other circumstances of this record, furnish ground for retrial of the question which the verdicts impliedly determined.

---

its exercise to the judgment and the consciences of the jury; that in deciding the question whether the accused should be put to death or sentenced to imprisonment for life it is within their discretion alone to determine, each for himself, how far he will accord weight to the considerations of the several objectives of punishment, of the deterrence of crime, of the protection of society, of the desirability of stern retribution, or of sympathy or clemency, of age, sex, human passion, ignorance or weakness, or (if appropriate under the evidence, of illness or intoxication or provocation not sufficient to reduce the degree or class of the crime), of the presumptions concerning, or possible uncertainties attaching to, life imprisonment, or of the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever which in the light of the evidence, the duty they owe to the accused and to the state, and the law as explained to them by the judge, appears to them to be important." (*People* v. *Friend* (1957), *supra, ante,* pp. 749, 767-768.)

The record reveals a tragic story of antagonisms flaming from the tinder of emotional immaturity. The inadequacy, whatever its source, lamentably was never remedied. Apparently the defendant and his wife engaged in altercations to such an extent that the cumulated goading effect on defendant brought him to a point where he wanted to, and decided that he would, commit the crimes of which he has been convicted. Until that fateful night of crime defendant apparently had been a law-abiding[5] and industrious[6] member of society, well-regarded in the community where he worked and lived.[7]

In a case such as the present one, it is difficult to understand upon what theory the jury could have based its selection of the death penalty other than the view that defendant's crimes were so disproportionate to his reasons therefor that he should receive a penalty equal to the fate which he inflicted on his estranged wife and stepson.[8] The theory that others will be deterred from like crimes and that society will thus be protected seems to have little practical application to killings arising out of domestic difficulties of the sort depicted by the record here. When a person such as defendant (with inadequate spiritual resources) has determined that the law-provided method for solving his difficulties (the divorce proceeding) is inadequate for his purpose, it seems that he would usually be unconcerned with the effect of his killings upon society or particular other persons or himself. For example, defendant here exposed his own 5-year-old son to a scene of carnage without hesitation although he expressed concern and love for the boy. And it does not appear likely that the death penalty is necessary for future protection of society against the killer here, for the probability of recurrence to the indi-

---

[5]Defendant reported to the psychiatrists who examined him in connection with this proceeding that he had never been arrested before his arrest on the charges here involved; that he served in the United States Army for two years without disciplinary action against him and that his discharge was honorable.

[6]Defendant reported to the psychiatrists that he was gainfully employed from the time of his graduation from high school in 1928 until the time of the crimes here involved. There is evidence that during defendant's marriage to Mrs. Brust he was employed not only in the postal service but also at "extra jobs"; he also worked on improvements of his home. He supported his step-children; their father did not comply with an order of court that he make payments for their support.

[7]There is abundant, undisputed evidence that defendant's reputation for peace and quiet was good.

[8]Stern retribution, although it is no longer the prime purpose of the criminal law, may be a relevant factor in selecting punishment. (*People v. Friend* (1957), *supra, ante,* pp. 749, 766-767.)

vidual of a set of circumstances such as those which caused defendant to kill appears extremely remote.

Not only do we mention the foregoing factors as reasonable explanation of the selection of the extreme penalty by the jury here; also we mention the various generally accepted purposes of punishment as matters of which the jury might appropriately be advised in connection with their selection of penalty for first degree murder.

While at least some of us may doubt that this defendant exemplifies the type of criminal who should be put to death for his crimes, we find in the record no legal basis for concluding that the proceedings in the trial court were invalid or that there was prejudicial error which caused a miscarriage of justice.

For the reasons above stated, the judgment and order denying a new trial are affirmed.

Gibson, C. J., Carter, J., Traynor, J., and McComb, J., concurred.

Spence, J., concurred in the judgment.

Appellant's petition for a rehearing was denied February 27, 1957.