[No. C056038. Third Dist. Jan. 14, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
BRENTON CLAY STANPHILL, Defendant and Appellant.

Counsel

Julia L. Bancroft, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, John G. McLean and Alison Elle Aleman, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**SIMS, Acting P. J.**—Defendant Brenton Clay Stanphill appeals from a judgment following revocation of probation (Pen. Code, § 1203.2) upon the trial court's finding that he participated in a gang-related battery (Pen. Code, §§ 242, 186.22) while incarcerated in jail as a condition of probation. The only evidence tying defendant to the battery was an unsworn hearsay statement of the victim to a law enforcement officer, identifying defendant's photograph as portraying one of the assailants, which the court allowed as a spontaneous statement under Evidence Code section 1240.[1] Defendant contends (1) the trial court abused its discretion in concluding the evidence was admissible as a spontaneous statement, and (2) defendant was denied his federal due process right to confront and cross-examine the adverse victim/witness at the probation revocation hearing. We shall conclude (1) the trial court did not abuse its discretion in ruling the victim's statements qualified as spontaneous statements under section 1240; and (2) because the evidence was admissible as spontaneous statements, defendant's due process confrontation right was satisfied, and no further inquiry was required. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2006, defendant was charged with (1) car theft (Veh. Code, § 10851, subd. (a)) with two prior convictions for car theft in 2002 and 2005 (Pen. Code, § 666.5, subd. (a)); (2) receipt of a stolen car (Pen. Code, § 496d, subd. (a)); and (3) possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)). Defendant pled nolo contendere. The probation report

---

[1] Undesignated statutory references are to the Evidence Code.

Section 1240 provides, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

indicated defendant was apprehended driving a stolen car with no front license plate and carrying small amounts of amphetamine and marijuana. In January 2007, the trial court convicted defendant and sentenced him to a three-year term (for the vehicle theft with priors) but suspended execution of sentence for five years, during which defendant was to be on formal probation with specified terms and conditions, including 365 days in county jail.

In February 2007, the People filed a petition alleging defendant violated probation on January 21, 2007, while incarcerated at Rio Consumes Correctional Center, by committing gang-related battery (Pen. Code, §§ 186.22, 242).

A joint hearing was held concerning defendant and another alleged perpe- trator (Alberto Vital, who is not a party to this appeal), with testimony from law enforcement officers who worked at the jail.[2] One deputy testified he observed a suspicious gathering of eight to 10 inmates in a dimly lighted area of the 600 pod[3] in the upper tier at the Rio Consumes Correctional Center. When another deputy turned up the lights, the inmates scattered back to their bunks. Inmate T.S. (the victim) slowly walked down the stairs toward the deputies. The victim had a bloody nose and some bumps and scrapes and said he had briefly lost consciousness. He was sent to the jail's medical office (where he made the challenged statements to a deputy) and was then transported to the hospital. A deputy described the procedure when fights break out in jail: Persons believed to be involved in the fight are removed from the pod and interviewed; statements are taken from witnesses; and others are told to remain in their bunks.

The victim had recently been moved to the 600 pod following his involvement in a fight in a different pod. An officer with gang expertise testified the victim and defendant are both listed as members of the Norteño gang (though there are 25 "sets" within the gang, and the officer did not say if they were in the same set).

The only evidence tying defendant to the attack in the 600 pod was the victim's hearsay statement to Deputy Nicholas Pottorff while in the jail's

---

[2] In Vital's separate appeal, we filed an unpublished opinion affirming the judgment on the grounds that substantial evidence supported the judgment and Vital failed to support his appellate contentions with analysis. (*People v. Vital* (May 22, 2008, C055563) [nonpub. opn.].)

[3] A pod is a housing location that can hold up to 74 persons. Inmates are generally allowed to move around the pod.

medical office, identifying defendant and others from a book of 64 photographs of the pod inmates (a locator card book).[4]

The prosecution subpoenaed the victim (who had since been released from jail) to appear as a witness, but the victim failed to appear. The prosecutor told the court, "I had an investigator go to his home. I spoke with some family members, he's not there right at the time." A bench warrant issued.

The following day, the prosecutor told the court the victim was still not present and "[t]hrough our due diligence, we've tried to find him. I've sent—obviously, you know a bench warrant was issued. Sent an investigator to his family's house where he was staying. Basically was told that he's left to go to another state. We went to the address of his current girlfriend who he's been with for about three years. No one is there. We have been to a cousin's gas station and a [sic] another family member's auto shop. They don't know where he is. Everybody, including his family, is under [sic] the opinion that he has left town. So with that said—

"THE COURT: Does anybody have any indication of the circumstances if [h]e went with, or what he took with him or—

"[Prosecutor]: I know that on the day that he came to my office, Your Honor, I had an investigator present with me. I do have that statement. He didn't deny what had happened but did indicate that he was really worried and scared for his family. We tried to get that statement recorded, however, the recorder malfunctioned. We don't have it recorded. I wish we did.

"I've had investigators try to contact him a couple more times, and I had more statements made. 'I'm not going to testify. I'm going to take the Fifth. I'm worried about my family.' Again, not denying it didn't happen but just saying he was scared.

"THE COURT: What was [the] last date that you had contact with him?

"[Prosecutor]: When I spoke to him over the phone two days ago to tell him he needed to be here yesterday.

"THE COURT: So today is the 21st. You spoke to him on the 19th to tell him to [be] here on the 20th?

"[Prosecutor]: Correct. He said, 'ma'am, I'll be there. I know I have to be there, but I'm not going to testify. I'm worried about my family.' "

---

[4] A supplemental probation report indicates defendant denied involvement in the fight.

The locator card book shows inmates in order of their assigned bunks, but it is common for inmates to switch bunks to be near friends.

The prosecutor asserted her representations went to the issue of availability.

The court asked what was the prosecutor's theory for admissibility of the hearsay statements. She said, spontaneous statements (§ 1240; see fn. 1, *ante*). The court asked if it had to find the witness unavailable in order to admit spontaneous statements. The prosecutor said no. The defense asked for a recess to research the matter. After the recess, defense counsel for codefendant Alberto Vital (who is not a party to this appeal) argued section 1240 requires due diligence by the prosecutor to produce the witness; the prosecutor had failed to show unavailability; and the victim was available "in the sense that there's been contact with him, the Court has issued a bench warrant for his arrest, that we know where he works, he's on a GPS ankle bracelet." When asked if he wished to be heard, defendant's counsel said, "Not as to that issue."

The trial court said, "I'm going to find that unavailability has no bearing on admissibility under [section] 1240."

The court next discussed *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), which held out-of-court testimonial statements by a witness are barred under the Sixth Amendment confrontation clause—regardless of their reliability—unless the witness is unavailable and the defendant had prior opportunity to cross-examine the witness. The prosecutor cited a federal case (*U.S. v. Hall* (9th Cir. 2005) 419 F.3d 980), holding *Crawford* does not apply to parole/probation revocation hearings, because the Sixth Amendment confrontation clause applies only to criminal prosecutions, and a hearing to revoke parole/probation is not a criminal prosecution.

Codefendant Vital's counsel noted *U.S. v. Hall, supra*, 419 F.3d at page 986, also said that, although the Sixth Amendment did not apply, the defendant nevertheless enjoyed a *due process* right to confront witnesses against him in the probation revocation hearing, which required the court to weigh the defendant's interest in confrontation against the government's good cause for denying it.

Defense counsel asked if the trial court had found good cause for unavailability of the victim. The court said, "I have found that unavailability is not pertinent to a 1240 inquiry. So to the extent the District Attorney must show good cause, more specifically must show due diligence before the Court can find somebody is unavailable [*sic*]. That only has to do with hearsay exceptions regarding availability."

Defendant asserted a due process objection.

The trial court concluded *Crawford* does not apply to this probation revocation hearing. In regard to defendant's due process claim, the court said, "in that regard, I believe we will need to hear the factors that accompany the statement that's offered so I can make a determination of reliability and whether the admission of that statement would violate defendants' right to due process."

However, the trial court never made a finding of good cause for absence of the victim as a witness in court.

The court heard testimony from Deputy Pottorff to determine reliability and admissibility of the victim's statement. The deputy said he turned on the lights around midnight in response to a gathering of inmates on the upper tier of the 600 pod. The inmates scattered back to their bunks, except one inmate (the victim) who came down the stairs. Deputy Pottorff spoke with the victim about 10 minutes after turning the lights on. The victim was injured and seemed disoriented. He said his head hurt and he felt like he was going to pass out. The deputy also testified the victim was breathing heavily and seemed upset (though the deputy admitted he did not include these observations in his written incident report). The deputy started asking questions, "Basically it was just who, what, where, why and when, what happened while you were you [*sic*] injured, type of things." The victim said he was attacked by "Northerners" in the pod and could identify who did it.

After the victim received first aid and while the victim was still in the medical office (which is about 300 feet from the pod), the deputy showed the victim the book of 64 photographs (with the deputy holding his hand over the written identifying information) and told the victim to look at each photograph and say yes or no, as to whether he believed the photograph depicted one of the assailants. This viewing occurred about 20 minutes after Deputy Pottorff's initial contact with the victim, i.e., about a half-hour after the disturbance. The deputy asked if the victim wanted to do it now or later, and the victim said he wanted to do it now. The victim looked at each photograph for up to an estimated 10 to 15 seconds and said words to the effect of "yes, that's one of them," for eight of the photographs in the book. The victim identified defendant as one of his attackers. While the victim looked through the book, the nurse, who was sitting nearby doing paperwork, dabbed at the victim's nose when she noticed it start to bleed.

The deputy's testimony concerning the victim's mental state was unclear. The deputy said the victim did not seem excited when he said he wanted to view the photographs at that time rather than later. The deputy also said the

victim did not seem "very excited [d]uring the lineup." However, the deputy also said the victim was upset, breathing heavily and was not calm as he made the identifications. The deputy admitted that he did not include these observations in his written report, and that it would be important to note such observations in the report.[5]

Among the eight men identified by the victim as his assailants were two men who were never charged with the offense, because officers on duty at the time saw them sleeping on the lower tier and did not see them on the upper tier.

Defense counsel argued the victim's identifications were not spontaneous statements and their admission violated defendant's constitutional right to confront witnesses.

The trial court said, "Before I rule on the spontaneous declaration, I want to first say that the deputy gave me some thought about *Crawford* and if *Crawford* does apply, I have found it does not. But if it does apply, I'm going to find that the statements made by the complaining witness were not testimonial. This is an officer who was responding to an exigency. He did not put together a photo spread collecting photographs and putting them into a six pack, as commonly would happen if an officer were collecting evidence. He did not make a full report regarding the witness's demeanor, did not ask any questions of the witness about what particularly happened, simply asked for identification of who the assailants were.

"And it appears that the officer was attempting to do that simply to main—to identify suspects and to take the steps necessary to preclude further trouble on the tier.[6] So I'll find that those statements are not testimonial and even if *Crawford* does apply to a Preliminary Hearing [*sic*] that *Crawford* does not bar those statements.

"In addition on the question whether they come within the hearsay exception under 1240, I am going to find that these statements took—the identifications took place within 20 minutes[7] of the declarant sustaining physical injury to the extent that the deputy indicated, the facial lacerations, the bleeding that was still being attended by the nurse in the course of the declaration. I'm also going to find the deputy's testimony credible, that the declarant was under stress and was breathing heavily.

---

[5] Defendant notes the deputy testified he was unaware the emergency room doctor noted the patient was not in acute distress. However, defendant fails to show any evidence was admitted concerning the doctor's observations. In any event, the point is unnecessary to our disposition.

[6] There was no testimony to this effect.

[7] It was 30 minutes.

"The other thing that's quite telling in this because a basic issue is whether the declarant had time to deliberate and to conjure up a story rather than to think clearly and look out for his own interest in making the statement. And [a deputy] gave credible testimony that it's actually against the declarant's best interest to identify these people and gave a credible scenario where somebody after a beating, while they are still excited and angry about that beating, might make those identifications despite their better reasoning saying, I had better not identify these folks because I might get beat again.

"In that regard, I think that the declarant's statements that he did not want to testify in this case support that. So I am going to find that the requirements of 1240 are met and that if the testimony had been offered is going to be identification of assailants that will be admissible [*sic*]."

The trial court heard further testimony from Deputy Pottorff, including that the victim said the Northerners called him over to a corner of the pod, where they knocked him down and started kicking him and punching him (wearing socks on their hands). The victim identified defendant as one of his attackers. After the disturbance the deputies removed all "Northerners" from the pod but later allowed two of them to return, because the deputies concluded they were not involved (despite having been identified as perpetrators by the victim).

The parties stipulated that the victim lied to police on prior unrelated occasions, going to the issue of credibility. The parties stipulated to the court's consideration of a written report of codefendant's investigator, Lori Brown, who said the victim told her he was unsure of his identifications, and the officers pressured him to press charges.

The trial court found true the alleged probation violation by a preponderance of the evidence (*People v. Rodriguez* (1990) 51 Cal.3d 437, 447 [272 Cal.Rptr. 613, 795 P.2d 783] (*Rodriguez*)), stating in part that the victim did not have to identify anybody; it was clear he had been beaten; this victim will lie when it suits him; it would make no sense for the victim to anger inmates by *falsely* identifying them as assailants;[8] it made sense that the victim gave truthful information while he was under the influence of the beating, bleeding, "when he gets that book pushed in front of him" and later regretted having identified the perpetrators and feared for his family and tried to recant to the defense investigator. The trial court concluded the victim's identification of defendant was reliable.

---

[8] We presume inmates who *did* participate in the beating would also get angry at being identified.

The trial court revoked probation and sentenced defendant to a midterm three-year sentence for vehicle theft with a prior conviction.

## DISCUSSION

### I. *General Legal Principles*

Under the Penal Code, "the court may revoke and terminate . . . probation if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation officer or otherwise that the person has violated any of the conditions of his or her probation . . . or has subsequently committed other offenses, regardless whether he or she has been prosecuted for such offenses." (Pen. Code, § 1203.2, subd. (a).) "After the receipt of a written report from the probation officer, the court shall read and consider the report and . . . the petition and may modify, revoke, or terminate the probation of the probationer upon the grounds set forth in subdivision (a) if the interests of justice so require." (Pen. Code, § 1203.2, subd. (b).) "The court shall have authority at any time during the term of probation to revoke, modify, or change its order of suspension of imposition or execution of sentence." (Pen. Code, § 1203.3, subd. (a).) "Before any sentence or term or condition of probation is modified, a hearing shall be held in open court before the judge." (Pen. Code, § 1203.3, subd. (b)(1).)

 Revocation of probation is not part of a criminal prosecution, and therefore the full panoply of rights due in a criminal trial does not apply to probation revocations. (*Rodriguez, supra*, 51 Cal.3d at p. 441.) "In placing a criminal on probation, an act of clemency and grace [citation], the state takes a risk that the probationer may commit additional antisocial acts," and "the state has a great interest in being able to imprison the probationer [for probation violations] without the burden of a new adversary criminal trial. [Citation.]" (*Id.* at p. 445.) The standard of proof in probation revocation proceedings is proof by a preponderance of the evidence. (*Id.* at p. 447.)

We shall discuss below the extent to which hearsay evidence may be admissible in a probation revocation proceeding.

### II. *The Victim's Identification Qualified as a Spontaneous Statement Which Was an Exception to the Hearsay Rule Under Section 1240*

Defendant contends the trial court abused its discretion by admitting introduction of the victim's statements as spontaneous statements under section 1240 (fn. 1, *ante*). Defendant argues the victim's statements and identification of defendant were not spontaneous, because they followed

detailed questioning by the deputy, were made after opportunity for reflection, and were unreliable. We shall conclude defendant fails to show the trial court abused its discretion.

■ "To qualify for admission under the spontaneous statement exception to the hearsay rule, 'an utterance must first purport to describe or explain an act or condition perceived by the declarant. (. . . § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.*, subd. (b).)' [Citation.] For purposes of the exception, a statement may qualify as spontaneous if it is undertaken without deliberation or reflection. [Citation.] Although . . . responses to detailed questioning are likely to lack spontaneity, . . . an answer to a simple inquiry may be spontaneous. [Citation.] The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 718–719 [21 Cal.Rptr.3d 682, 101 P.3d 568] (*Morrison*).)

"The decision to admit evidence under . . . section 1240 is reviewed for abuse of discretion. [Citation.] 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] . . . In performing this task, the court "necessarily [exercises] some element of discretion . . . ." ' " (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588–1589 [62 Cal.Rptr.3d 418].) We will uphold the trial court's determination if its resolution of factual questions is supported by substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].) We review for abuse of discretion the ultimate decision whether to admit the evidence. (*Ibid.*)

*Morrison, supra*, 34 Cal.4th 698, upheld admissibility of a police officer's testimony that he responded to a crime scene, saw a victim with apparent gunshot wounds who looked like she might lapse into unconsciousness or even die on the spot, and asked her who did it. She responded by identifying three persons—Shawn Berry, Michael Berry and " 'a male Negro by the name of Jesse [the defendant's first name].' " (*Id.* at p. 718.) The Supreme Court said: "[S]tatements purporting to name or otherwise identify the perpetrator of a crime may be admissible [under section 1240] where the declarant was the victim of the crime and made the identifying remarks while under the stress of excitement caused by experiencing the crime. (See, e.g., [*People v.*] *Farmer* [(1989) 47 Cal.3d 888, 904–905 [254 Cal.Rptr. 508, 765 P.2d 940][9]] [statements of shooting victim in response to questioning of police dispatcher and officer at the scene helped describe the crime by identifying the perpetrator]; *People v. Anthony O.* (1992) 5 Cal.App.4th 428,

---

[9] *People v. Farmer, supra*, 47 Cal.3d 888 (*Farmer*), was overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, footnote 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].

433 [6 Cal.Rptr.2d 794] [seconds after shooting, victim stated to police officer, ' "I just been shot. You got the wrong car. It was Sharky from El Sereno." ']; *In re Damon H.* (1985) 165 Cal.App.3d 471, 474, 476 [211 Cal.Rptr. 623] [in response to his mother's question why his buttocks hurt, crying minor stated, ' "[b]ecause Damon put his weenie in my butt" ']; *People v. Jones* (1984) 155 Cal.App.3d 653, 659–662 [202 Cal.Rptr. 289] [when a treating physician asked a burn victim, 30–40 minutes after his injury, what had happened, victim responded that the person ' "I live with threw gasoline on me" '].)" (*Morrison, supra,* 34 Cal.4th at p. 719.) However, *Morrison* also said, "Moreover, where the spontaneous declarant is available as a witness, as [the victim] was here, 'the existence and truth of the declaration may be explored in an examination under oath.' [Citation.]" (*Ibid.*)

"[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief. [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*Farmer, supra,* 47 Cal.3d at pp. 903–904.)

Here, the physical attack on the victim was an event likely to induce stress and excitement. However, the deputy's testimony concerning the victim's mental state was not entirely clear. The deputy said the victim was not excited when he announced himself ready to view the photographs, and the victim did not seem "very" excited "[d]uring the lineup." However, the deputy also said the victim was upset, breathing heavily and was not calm as he made the identifications. Thus, there was some evidence supporting the trial court's determination of spontaneous statement. That the deputy did not include these observations in his written report does not render the trial court's decision an abuse of discretion. The 30-minute interval between the incident and the identification does not strip the statement of spontaneity. (*People v. Poggi* (1988) 45 Cal.3d 306, 319 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People v. Saracoglu, supra,* 152 Cal.App.4th at p. 1589.) Even assuming the victim took a full 15 seconds to view defendant's photograph before identifying him as one of the perpetrators, that circumstance would not defeat a finding of spontaneity. Defendant cites *People v. Gutierrez* (2000) 78 Cal.App.4th 170 [92 Cal.Rptr.2d 626], which said a spontaneous statement must be the product of a reaction to a stimulus (an exciting event such as witnessing a robbery) and "not the product of processing information in a

deliberative manner." (*Id.* at p. 181.) However, *Gutierrez* went on to conclude the trial court did not err in admitting a handwritten license plate number as a spontaneous declaration, and "the fact that the declarant had to go through the process of obtaining paper and a writing implement, and then reduce his observation to writing, is not the kind of reflection and deliberate thought that disqualifies a writing from being a spontaneous declaration." (*Ibid.*) That the victim may have looked at defendant's photograph for up to 15 seconds before identifying defendant as one of the assailants does not necessarily reflect a processing of information in a deliberative manner that will defeat a finding of spontaneous declaration, particularly given the victim's head injury.

Defendant fails to support his assertion that the victim's statements were involuntary.

■ Defendant claims *Farmer, supra,* 47 Cal.3d 888, determined that a spontaneous statement is one that is voluntary and is initiated by, or at least not elicited from, the speaker. However, *Farmer* said this described "one sense" of spontaneity, and *Farmer* went on to say section 1240 uses "spontaneous" in the broader sense of actions undertaken without deliberation or reflection. (47 Cal.3d at p. 903.)

Defendant argues the victim's statements and identification were not spontaneous but followed detailed questioning. However, "[t]he fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity." (*Farmer, supra,* 47 Cal.3d at p. 904.) "More detailed questioning . . . is likely to deprive the response of the requisite spontaneity. [Citations.] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. [Citation.]" (*Ibid.*)

Here, although the deputy asked questions about what happened (who, what, where, why, etc.), when it came to identification, the deputy merely asked the victim to look at the photographs and say yea or nay to each photo. Defendant claims the thoroughness of the questioning was revealed in the victim's later statement to the investigator that he felt pressured by the officers. However, the cited evidence shows only that the investigator said the victim said the officers pressured him "to press charges."

Defendant's cited cases do not compel a conclusion that detailed questioning deprived the statements of spontaneity in this case. (*People v. Poggi, supra,* 45 Cal.3d at p. 318; *Dolberg v. Pacific Electric Ry. Co.* (1954) 126 Cal.App.2d 487, 488–490 [272 P.2d 527]; *People v. Trimble* (1992) 5

Cal.App.4th 1225, 1234 [7 Cal.Rptr.2d 450].) *Poggi* and *Trimble* held the trial court did not abuse its discretion in finding statements were spontaneous. *Poggi* said, "When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] But . . . , 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' [Citation.]" (*Poggi, supra,* 45 Cal.3d at p. 319.) *Dolberg, supra,* 126 Cal.App.2d 487, said nothing about detailed questioning. In that personal injury case, a police officer testified he responded to the scene of the accident and talked to the injured person, who told him what happened. (*Id.* at p. 488.) The appellate court found no abuse of discretion in the trial court's ruling to the effect that the statements were not voluntary and spontaneous, and were made so long after the time of the accident as to indicate the probability of deliberate design. (*Id.* at pp. 489–490.) *Farmer, supra,* 47 Cal.3d at page 904, in stating that detailed questioning may deprive a response of spontaneity, cited *Dolberg,* but with the signal "cf.," which means the cited case is analogous or is to be compared with other cases. (Cal. Style Manual (4th ed. 2000) § 1:4, p. 10.)

Defendant questions how much the victim could have perceived in the "nearly dark" pod, particularly since the victim had been in the pod for less than a week and said he briefly lost consciousness. To be admissible, the statement must describe an act perceived by the declarant. (§ 1240; see fn. 1, *ante.*) Clearly, the victim perceived the beating, even if he briefly lost consciousness. Moreover, though the pod was dimly lit, the perpetrators were not strangers to the victim but were fellow inmates. Defendant complains there was no evidence the parties knew each other or had prior contact. However, no such evidence was required. Defendant suggests it is unclear whether the victim was identifying Northerners or his assailants when he went through the photographs. Defendant notes the victim identified two persons who were not involved. However, the deputy testified he told the victim to look at each photograph and let the deputy know "whether he believed it was one of the people that attacked him." That defendant misidentified two persons does not render section 1240 inapplicable.

Defendant says the victim told the prosecution's investigator that he (the victim) was not really sure the people he identified were actually involved. However, it appears from the cited transcript that it was codefendant's investigator, not the prosecution's investigator, who made this report in a written statement considered by the court pursuant to stipulation of the parties, after the court ruled the identification admissible under section 1240 and moved on to the due process question. Thus, this report was not before the court in making its evidentiary ruling. Moreover, at the end of the

hearing, the trial court concluded, "it makes complete sense that while he is under the influence of that beating, while he is bleeding, and while he was coming down the stairs and pushed the panic button, when he gets that book pushed in front of him, it makes sense that he would identify the people who had hurt him. [¶] It also makes sense that as he thinks about it a little more, and particularly when he is being questioned by someone who identifies himself as a lawyer for the people who are charged, that he might say that those identifications were not reliable. [¶] He does indicate that he feels his family is in some danger. I don't think there's anything for him to be gained by saying that." The court concluded, "on balance, and using preponderance of the evidence standard, I have got to believe that his statement was reliable, and [defendant] took some part in that beating."

Defendant argues there was no evidence that the eight persons identified by the victim were all members of the "Northerners" gang or that they knew each other. However, no such evidence was required.

Defendant argues the victim lacked credibility, and his statements were self-serving. Defendant suggests that, since the victim was involved in a fight in his prior pod, he had a motive to lie and claim he was assaulted rather than admit participation in another fight. Defendant argues the victim's story did not hold up, because he said he was assaulted for having refused to participate in a fight in the new pod, whereas he had shown himself willing to fight in the prior pod. None of these points required the trial court to rule section 1240 inapplicable. Defendant also argues the victim's statements were self-serving because, having been assaulted, it is reasonable to assume he wanted to be removed from that pod. However, his physical injuries sufficed for that purpose.

In his discussion of section 1240, defendant argues the victim's statements were not reliable. However, the cited cases addressed reliability in connection with the defendants' constitutional claims (as do we, *post*), not as a matter of state evidentiary law. (*In re Damon H., supra*, 165 Cal.App.3d at p. 477; *People v. Jones, supra*, 155 Cal.App.3d at p. 662.)

We conclude defendant fails to show the trial court abused its discretion in applying section 1240.

That the admission of the evidence complies with state evidentiary law does not end the inquiry. We now turn to the federal constitutional question.

III. *The Federal Constitution Does Not Require That the Victim-witness Be Available for Cross-examination at the Probation Revocation Hearing*

■ On appeal, defendant acknowledges that *Crawford v. Washington, supra,* 541 U.S. 36 (which bars testimonial hearsay in criminal prosecutions under the Sixth Amendment's confrontation clause unless the declarant is available to testify or the defendant had prior opportunity to cross-examine) is inapplicable to probation revocation proceedings, because the Sixth Amendment confrontation clause applies only to "criminal prosecutions," and a probation revocation hearing is not a "criminal prosecution." (*Rodriguez, supra,* 51 Cal.3d at pp. 441, 445, 447; *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1199, fn. 2 [60 Cal.Rptr.3d 616]; *U.S. v. Hall, supra,* 419 F.3d at p. 985.)

Defendant contends that, although the Sixth Amendment is inapplicable, he had a federal *due process* right to confront and cross-examine the witness at the probation revocation hearing, and the trial court failed to apply the proper balancing test for admissibility. We shall conclude that, although defendant had due process rights, the due process balancing test for admissibility of hearsay does not apply to evidence falling within the hearsay exception for spontaneous statements.

The parties fail to address the standard of review. We apply de novo review (*People v. Cromer* (2001) 24 Cal.4th 889, 894–904 [103 Cal.Rptr.2d 23, 15 P.3d 243] [de novo review applies where mixed questions of law and fact implicate constitutional rights]), but we would reach the same result even under a lesser standard.

Although the *Sixth Amendment* confrontation clause does not apply in probation revocation proceedings, probationers have a general *due process* right to confrontation and cross-examination in such proceedings. (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 786 [36 L.Ed.2d 656, 664, 93 S.Ct. 1756]; *Morrissey v. Brewer* (1972) 408 U.S. 471, 489 [33 L.Ed.2d 484, 499, 92 S.Ct. 2593]; *People v. Arreola* (1994) 7 Cal.4th 1144, 1150 [31 Cal.Rptr.2d 631, 875 P.2d 736] (*Arreola*); *People v. Shepherd, supra,* 151 Cal.App.4th 1193, 1199, fn. 2; *U.S. v. Hall, supra,* 419 F.3d at p. 985.) Thus, the minimum due process requirements for a probation revocation hearing include the general right " 'to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) . . . .' [Citation.]" (*Arreola, supra,* 7 Cal.4th at p. 1154, quoting *Morrissey v. Brewer, supra,* 408 U.S. at p. 489.)

*U.S. v. Comito* (9th Cir. 1999) 177 F.3d 1166 said in the course of partially reversing revocation of supervised release, "[t]he weight to be given the right

to confrontation in a particular case depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence. [Citation.] . . . '[T]he more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect "verified fact." ' [Citation.] So, too, the more subject to question the accuracy and reliability of the proffered evidence, the greater the releasee's interest in testing it by exercising his right to confrontation." (*Id.* at p. 1171, fn. omitted; accord, *U.S. v. Hall, supra,* 419 F.3d at p. 986.) The *Comito* balancing test was endorsed in *In re Miller* (2006) 145 Cal.App.4th 1228 [52 Cal.Rptr.3d 256], which observed that *Comito* is nearly identical to the standard articulated in *Arreola* and that the State of California had agreed in a federal case (*Valdivia v. Davis* (E.D.Cal. 2002) 206 F.Supp.2d 1068) to develop parole policies consistent with *Comito.* (*Miller, supra,* 145 Cal.App.4th at pp. 1236–1237 [held parole board improperly relied on unsworn hearsay without determining unavailability of declarant or reliability of the statement].) Though this case involves probation rather than parole, the two are equivalent in terms of due process requirements. (*Rodriguez, supra,* 51 Cal.3d at p. 441.)

However, the foregoing cases are distinguishable from the case before us, because they did not turn on evidence falling within a recognized hearsay exception, such as that for spontaneous statements. *Arreola* involved admission of a preliminary hearing transcript at a defendant's probation revocation hearing. The court held that admission of the transcript, without any showing of witness unavailability or other good cause for denying the defendant's due process right to confront and cross-examine, violated federal due process (though the error was harmless beyond a reasonable doubt due to the presence of other evidence). (*Arreola, supra,* 7 Cal.4th at pp. 1160–1161.) One case, *U.S. v. Hall, supra,* 419 F.3d at page 987, said that some of the evidence supporting a domestic violence allegation was admissible under hearsay exceptions (business records and statement for purpose of medical treatment), and "long-standing exceptions to the hearsay rule that meet the more demanding requirements for criminal prosecutions should satisfy the lesser standard of due process accorded the respondent in a revocation proceeding." (*Ibid.*) However, *Hall* nevertheless applied the *Comito* balancing test and said the fact that some of the evidence constituted hearsay exceptions weakened Hall's interest in excluding hearsay evidence, especially when weighed against the government's good cause for not producing the witness. (*Ibid.*) *Hall* did not discuss whether the balancing test could be bypassed for long-standing exceptions to the hearsay rule.

It is an open question as to whether the court must perform the balancing test when evidence is admissible under an established hearsay exception. Numerous cases discuss good cause and balancing, but not where the

evidence was admissible under a hearsay exception. (E.g., *People v. Abrams* (2007) 158 Cal.App.4th 396, 405, fn. 6 [69 Cal.Rptr.3d 742]; *In re Miller, supra*, 145 Cal.App.4th at pp. 1238–1241.) The California Supreme Court in *People v. Maki* (1985) 39 Cal.3d 707 [217 Cal.Rptr. 676, 704 P.2d 743], said in dictum that if evidence was admissible under an exception to the hearsay rule, "then there is no need to inquire as to whether and what flexible standards may be applied to the use of otherwise inadmissible documentary evidence in revocation proceedings." (*Id.* at p. 710 [documentary evidence did not fall within hearsay exception].) "Neither the Supreme Court nor the Ninth Circuit has ruled directly on whether hearsay exceptions obviate the need for a balancing test in parole revocation proceedings. . . . [W]hile some Ninth Circuit authorities suggest the court may favor admitting proffered evidence on the basis it falls within a hearsay exception, the question has not been posed directly to the court; rather, the inference arises from *dicta* or from the types of evidence it allowed." (*Valdivia v. Schwarzenegger* (E.D.Cal. 2008) 548 F.Supp.2d 852, 859.) Although not binding on us, we observe this issue is being litigated in the federal district court in *Valdivia v. Davis, supra,* 206 F.Supp.2d 1068 (in which California stipulated to an injunction requiring it to apply *Comito* in parole cases). In *Valdivia v. Schwarzenegger,* the state has taken the position that hearsay evidence which falls within a recognized hearsay exception may be admitted without applying the *Comito* balancing test. (*Valdivia v. Schwarzenegger, supra,* 548 F.Supp.2d at pp. 855–856, 859–866.) A special master disagreed, giving as one reason[10] that the *Comito* test recognizes that hearsay exceptions have an important role in admission decisions, by increasing reliability and reducing the weight of the parolee's interest in the balance, but they do not defeat the interest in confrontation. (*Valdivia v. Schwarzenegger,* at p. 865, citing *U.S. v. Hall, supra,* 419 F.3d 980, 988 ["Simply because hearsay evidence bears some indicia of reliability does not render it admissible . . . Hall's otherwise strong interest in confrontation is somewhat lessened by the reliability of the hearsay evidence, but it is not defeated." (*Hall,* at p. 988.)].) The federal district court issued an order adopting the special master's recommendations and declined to stay its order pending appeal. (*Valdivia v. Schwarzenegger,* at p. 853; *Valdivia v. Schwarzenegger* (E.D.Cal., May 6, 2008, No. CIV. 5-94-671 LKK/GGH) 2008 U.S.Dist. Lexis 41397 [order denying stay].)

We need not decide whether hearsay exceptions in general are exempt from the due process balancing test. Here, we discuss only one specific hearsay exception—spontaneous statements.

---

[10] Another reason given by the special master was that many parole hearing officers are not judges or lawyers and therefore not well versed in the nuances of hearsay exceptions. (*Valdivia v. Schwarzenegger, supra,* 548 F.Supp.2d at p. 866.) This reason obviously does not apply to our case.

We do not accept the People's apparent concession that good cause was required in order to justify denying defendant's due process right to confront and cross-examine the witness. (The People claim good cause was shown and was found by the trial court.)

■ We believe spontaneous statements under section 1240 are a special breed of hearsay exception which automatically satisfy a probationer's due process confrontation/cross-examination rights without the court having to find good cause for the witness's absence under *Arreola* or perform the *Comito* balancing test. "The theory of the spontaneous statement exception to the hearsay rule is that since the statement is made spontaneously, while under the stress of excitement and with no opportunity to contrive or reflect, it is *particularly* likely to be truthful. As explained by Wigmore, this type of out-of-court statement, because of its 'superior' trustworthiness, is *'better than* is likely to be obtained from the same person upon the stand . . . .' (6 Wigmore, Evidence (Chadbourn ed. 1976) § 1748, p. 199, italics added.) Unlike other hearsay exceptions in which the unavailability of a witness makes it 'necessary' to resort to hearsay as a weaker substitute for live testimony (5 Wigmore, Evidence (Chadbourn ed. 1974) § 1420, p. 251), the spontaneous statement exception involves a 'necessity' of a different sort: '[T]hat we cannot expect, again, or at this time, to get *evidence of the same value* from the same or other sources' (*id.* at § 1421, p. 253, italics in original) and '[t]he extrajudicial assertion being better than is likely to be obtained from the same person upon the stand, a necessity or expediency arises for resorting to it.' (6 Wigmore, Evidence, *op. cit. supra*, § 1748, p. 199.) This is why unavailability of the declarant as a witness need never be shown under this exception. (*Ibid.*; 6 Cal. Law Revision Com. Rep. (1964) appen. pp. 465–466. See also *People* v. *Brust* (1957) 47 Cal.2d 776, 785 [306 P.2d 480].)" (*People v. Hughey* (1987) 194 Cal.App.3d 1383, 1392–1393 [240 Cal.Rptr. 269] [criminal trial].)

Given this unique nature of spontaneous statements, we believe the reliability and necessity inherent in such evidence automatically establishes good cause for denying confrontation sufficient to render balancing unnecessary.

We have already concluded the trial court did not abuse its discretion in applying section 1240 to the victim's statements.

■ We further conclude that, since the evidence was admissible as spontaneous statements under section 1240, the trial court was not required to find good cause for the victim's absence or to perform the *Comito* balancing test. There was no constitutional error, and defendant fails to show grounds for reversal.

## DISPOSITION

The judgment is affirmed.

Davis, J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 22, 2009, S170587. Corrigan, J., did not participate therein. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.