Filed 3/22/16  P. v. Zapata CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C076320 |
| v. | (Super. Ct. No. 13F04161) |
| GIANCARLO ZAPATA, | |
| Defendant and Appellant. | |

A jury found defendant Giancarlo Zapata guilty of assault with a deadly weapon, making criminal threats, and spousal battery.  The jury also found true the allegation defendant personally used a dangerous weapon while making criminal threats.  The trial court sentenced defendant to serve three years in state prison.

On appeal, defendant contends the trial court erred in admitting (1) hearsay evidence of text messages between the victim and a girlfriend, and (2) evidence of his prior conviction for battery that was previously expunged under Penal Code section 1203.4.  We conclude any error was harmless.  We affirm the judgment.

1

# I

## FACTUAL AND PROCEDURAL BACKGROUND

### A.

### *Underlying Facts*

Wendie Rashid and defendant met in October 2010 when Wendie was separated from her husband. She and defendant soon began dating and continued to date "off and on" for more than two years. During their relationship, Wendie and defendant would sometimes joke around while they were cooking and on one occasion, Wendie playfully put a knife to defendant's throat. But Wendie never threatened defendant.

Then, in December 2012, Wendie and defendant began to argue while they were having sex. Defendant left the room, Wendie remained lying on the bed. Defendant returned to the room holding a "paring knife"; he "got on top" of Wendie, put the knife to her throat, and said: "I'll kill you." Wendie was not physically injured and she did not report the attack to the police. Defendant ended the relationship a few days later but they continued to send each other text messages. During that same time, Wendie wrote a letter to defendant telling him how much she loved him and how much she missed him but she did not give defendant the letter until February 2013.

Wendie and defendant started dating again in February 2013. They broke up in April 2013, then resumed dating again sometime thereafter. By June 2013, they were seeing each other on a weekly basis, generally on Friday nights when Wendie's six-year-old daughter was not with her.

On Friday night, June 28, 2013, defendant was with his friends at one bar, Wendie was with her friends at another but they planned to meet up later that night. Around 11:20 p.m., Wendie left her friends to get defendant from the bar where he was with his friends. When she arrived at the bar, defendant was standing outside. He smelled of alcohol and though he seemed "happy," he appeared to have "had too much to drink." As they put defendant's backpack and bicycle into Wendie's car, defendant's male friend

approached them and said, " 'So we were going to come back to [defendant's] place with you guys tonight.' "

Wendie was surprised by the friend's comment. She asked defendant whether people were in fact coming back to his apartment. Defendant said yes; defendant told his friend that he could watch defendant and Wendie have sex. This made Wendie angry and during the short drive to defendant's apartment, she told defendant as much. Wendie also told defendant he was disrespectful and she was "done." Defendant yelled in Wendie's face, " 'You're done. You're done. I'll fucking kill you.'"

Wendie was scared. She told defendant to " 'get out of [her] face,' " but he continued to get closer so she put her hand on defendant's face and pushed him away. Defendant responded: " 'You are going to put your hands on me. I will fucking kill you.' " Defendant then grabbed Wendie by the hair, pulled her head back, and pushed it into the driver's side window. Defendant also put his elbow into Wendie's right bicep and, using his own body weight, shoved her down. Wendie was still driving the car but was nearly at defendant's apartment; she hit the brakes to get defendant off of her.

Inside defendant's apartment community, Wendie parked the car. Defendant reached over and grabbed the keys from the car's ignition. Wendie got out of the driver's seat, grabbed defendant's bicycle from the backseat, and "threw it" in the parking lot. Defendant came up behind Wendie and pushed her in the back. Wendie asked defendant for her keys but he ignored her and walked up the stairs to his apartment. Wendie followed him.

Inside defendant's apartment, Wendie saw defendant was still holding her keys. She tried to take the keys from defendant and he "jerked them" from her, causing them to come apart and "fly" into the apartment. Defendant again came up behind Wendie and shoved her. This time he shoved her over a couch and she landed on the living room floor. Defendant climbed on top of Wendie, straddling her chest, her right arm under his left leg. With his left hand on Wendie's throat and a "butcher knife" in his right hand,

3

defendant said, "I will fucking kill you." Wendie thought defendant was going to stab her in the throat; she thought she was going to die. She put her hand up to defend herself and defendant cut two of her fingers with the knife. Defendant then released his grasp and got off of her. Wendie got her keys and left, intending to go to the hospital.

Wendie left defendant's apartment disheveled and with blood on her clothes. Not wanting to go to the hospital in that condition, Wendie went home to change. While she was driving, Wendie knew she was not "going to tell the hospital the truth about what happened" because she was afraid defendant would attack her again. She sent a text message to her friend Andrea so someone would know the truth in case defendant "came after [her] again."

"Andrea [defendant] just tried to kill me. On my way to hospital. Omygod." The following exchange of messages then took place:

"[Andrea:] WTF?!?!!! Wendie. R u ok?!

"[Wendie:] No Andrea. He tried to kill me. It's bad

"[Andrea:] Where r u. What do U need me to do

"[Wendie]: Does Jeff know anyone who could put the fear of god in him?

"Rob[1] will kill him if he finds out.

"[Wendie:] Almost at hospital.

"[Andrea]: Which one? I'll meet u there

"[Wendie]: My [hand] is bleeding really bad. I put it up because he tried to stab me in the throat.

"It's ok Andrea. I'm in Roseville now. I just needed you to know in case I need someone to speak for me.

"Danielle knows too cause I was with her tonight.

---

**1** Rob is Wendie's husband.

4

"[Andrea:] U didnt call the police?  Wendie?  I don't know what to do.  What do u want me to do.  I'm scared for u and I love u but this has got to stop.

"[Wendie:] Rob will kill him if he finds out.  No I didn't call police.  Rob can't find out.

"[Andrea]:  Wendie!  Listen to yourself!  Think about Audra.  Stop being selfish!!!!! U are that little girls world.  This is not about pleasing somebody else.  This is about staying alive to be Audra's mother

"[Wendie]:  He took my keys.  He pushed me down in the street & then in his apartment.  He took out a butcher knife & went to stab me in the throat.  I put my hand up & that's when he sliced through my fingers."

"[Andrea:]  What hospital r u at

"Answer my call please.

"[Wendie:]  Sutter Roseville.

"[Andrea:]  Ok.  I'm on my way.

"[Wendie:]  I can't.  I'm in emergency.

"No honey please don't come please!

"I've already told the nurse that I cut my own hand.

"[Andrea:]  It's either I drive out there and u see me or its i call rob.  U choose.

"[Wendie:]  Why? Please!

"I'm calling one of my brothers in Utah.  He'll take care of [defendant].

"[Andrea:]  Where r u?  Jeff[2] just got there.

Wendie lied to the nurse in the emergency room because she did not want anyone, other than her close friends, to know what happened to her.  She was afraid defendant would come after her and "finish[] the job," and she was afraid Rob would "go after"

---

**2**     Jeff is Andrea's husband.

5

defendant. The hospital staff, however, was not convinced Wendie cut her own hand and they contacted the police to report Wendie was potentially the victim of domestic violence. Deputy Sheriff Gene Goff responded to the call.

At the hospital, Deputy Goff spoke to Wendie, who was calm but appeared scared and nervous to be talking to Deputy Goff. During their conversation, Wendie gave Deputy Goff the name of the person who injured her. Deputy Goff also asked Wendie if he could see her injury. Wendie removed the bandage and showed Deputy Goff an open, bleeding wound near her fingers. Wendie received three stitches in her middle finger and four stitches in her ring finger. She said nothing about bruises to the hospital staff, or pain anywhere other than her cut fingers. Deputy Goff, however, saw a bruise on the inside of Wendie's right bicep and some scratches across the top of her chest. Photographs of Wendie's injuries were taken seven days later.

### B.

### Pre Trial Motions and Trial

The People charged defendant with assault with a deadly weapon, making criminal threats, and spousal battery. The People further alleged defendant inflicted great bodily injury on Wendie and personally used a dangerous and deadly weapon when threatening her.

Defendant pleaded not guilty to the charges and allegations, and a jury trial began in March 2014.

Prior to the admission of evidence, the People moved to introduce testimony from defendant's previous girlfriend, Jennifer B., under Evidence Code section 1109. Jennifer would testify regarding the violence defendant inflicted on her that lead to his conviction for battery in 2008. The People also moved to admit evidence of defendant's 2008 conviction for battery.

Defense counsel did not object to Jennifer's testimony, but claimed admitting the fact of defendant's prior conviction for battery was prejudicial under Evidence Code

6

section 352. Defendant argued the conviction itself was simply "piling on" to the Evidence Code section 1109 evidence Jennifer would give in her testimony. The trial court had its own concern that the fact of the conviction was inadmissible because defendant had the conviction "expunged" under Penal Code section 1203.4 Ultimately, however, the trial court ruled Jennifer's testimony regarding defendant's violence against her, and the fact defendant was convicted for battery as a result of his conduct, were both admissible.

During trial, Jennifer testified that in March 2008, defendant came to her apartment intoxicated. They went to bed, defendant was restless, and Jennifer turned on the light. Angry she turned on the light, defendant grabbed Jennifer by the legs and "tried to flip [her] up over the balcony." Defendant was unsuccessful and Jennifer tried to run down the stairs; half way down, defendant jumped on Jennifer's back knocking them both to the floor. Jennifer's face hit the front door and they wrestled. Defendant repeatedly shoved Jennifer into the wall and threw cans of food at her, hitting her in the hands and forearms.

After hitting her with the cans of food, defendant began hitting and kicking Jennifer in the face, body, and arms. Jennifer tried to get away and defendant bit her on the shoulder. Eventually, Jennifer was able to escape and call the police. Defendant was convicted of misdemeanor battery.

During the prosecutor's direct examination of Wendie, the prosecutor introduced the text messages between Wendie and Andrea. Wendie testified she was "completely distraught" when she was texting Andrea. Defense counsel objected, arguing the text messages were inadmissible hearsay. The court asked Wendie "what was the time of the event compared to the time of the text messages." Wendie testified she sent the first message as she was leaving defendant's apartment. The court overruled defense counsel's objection.

7

As Wendie continued to testify regarding the text messages, defense counsel objected on the basis of relevance and speculation. The trial court overruled these objections as well. Eventually, counsel and the trial court had a discussion off the record regarding the text messages. Following that conversation, the court said: "Based on the foundation that was laid, I overruled the hearsay objection based on Evidence Code section 1240. I believe that statement under those circumstances met the spontaneous declaration exception." And while the later text messages did not fit within the spontaneous declaration exception, defense counsel waived any hearsay objection to the later text messages. Defense counsel explained, "once the court allowed the first conversation to come in we could not, in essence of trying to do a good job basically, not allow the others to come in for strategy purposes."

Detective Dennis Prizmich, an expert in intimate partner battery and domestic violence issues, testified about the behavior of domestic violence victims and the cycle of abuse. He described how alcohol can trigger the cycle and how abusers manipulate their victims with money, isolation, love, and guilt. Prizmich explained how victims of domestic violence frequently exhibit "counter-intuitive behavior." For example, victims of domestic violence often do not report the abuse inflicted on them, they return to their abusers, and they often do not cooperate with law enforcement to have their abusers prosecuted. Prizmich also noted that when investigating one act of abuse, a victim will often report prior acts of abuse that were unreported.

The jury ultimately found defendant guilty of assault with a deadly weapon, making criminal threats, and domestic violence. The jury also found true the allegation defendant personally used a dangerous and deadly weapon but found not true the allegation he personally inflicted great bodily harm on Wendie. The trial court subsequently sentenced defendant to serve an aggregate term of three years in state prison.

## II

## DISCUSSION

Defendant contends it was an abuse of discretion for the trial court to admit as spontaneous declarations the text messages between Wendie and Andrea because Wendie's text messages "indicate she deliberated about what to say and engaged in a reflective process."

## A.

### *The Trial Court Erred in Admitting the Text Messages.*

A spontaneous declaration or excited utterance is an exception to the hearsay rule that "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) Written statements can be considered spontaneous if they are "not the product of processing information in a deliberative manner." (See *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 180-181.) In other words, the statements must be written down before the declarant has had time to "contrive and misrepresent." (*Ibid.*)

Here, despite Wendie sending the text messages immediately after defendant attacked her, it is clear from the record the messages were the product of deliberate thought and not a spontaneous utterance. As Wendie testified to at trial, she knew when she texted Andrea that she intended to lie to the staff at the hospital because she was afraid of defendant, but she wanted someone to know the truth. Accordingly, the text messages cannot be a spontaneous utterance and their admission was an abuse of the trial court's discretion. (See *People v. Stanphill* (2009) 170 Cal.App.4th 61, 73 [whether the trial court erred in admitting a spontaneous statement is reviewed for abuse of discretion].)

9

## B.

### *The Error in Admitting the Text Messages Was Harmless*.

Although we conclude it was error to admit the text messages between Wendie and Andrea, we also conclude it is not reasonably probable a result more favorable to defendant would have been reached were the text messages not admitted.

" 'No judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citations.] '[A] "miscarriage of justice" should be declared only when the court . . . is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Callahan* (1999) 74 Cal.App.4th 356, 363; see Evid. Code, § 353, subd. (b).)

At trial, Wendie testified in detail about defendant's attack on her. She had documented injuries, witnessed by hospital staff and Deputy Goff, that were consistent with her testimony. She acknowledged initially lying to the hospital staff, telling them she cut herself, but explained it was because she was scared. Nevertheless, when Deputy Goff interviewed Wendie in the hospital, she abandoned the story about cutting herself and told Goff she was attacked. Wendie even told him who attacked her.

Wendie also testified defendant had attacked her in the past, though she admitted she did not report the attack and renewed the relationship with defendant later. Detective Prizmich, an expert in intimate partner battering and domestic violence, testified that victims of domestic violence frequently engage in "counter-intuitive behavior." Victims, he said, often do not report the abuse and they often return to their abuser. Prizmich also testified alcohol can trigger the "cycle of violence." Prizmich's testimony, thus not only offered a reasonable explanation for conduct the jury may have found inconsistent with

10

Wendie's testimony, but Prizmich's expert testimony supported much of Wendie's testimony.

In addition to Wendie's testimony, the jury also heard defendant's previous girlfriend, Jennifer, describe defendant's attack on her in March 2008. In sum, on this record, we conclude it was not reasonably probable defendant would have received a more favorable result had the text messages not been admitted.

### C.

### *Any Error in Admitting Defendant's 2008 Conviction for Battery Was Harmless*

Defendant further contends the trial court erred in admitting his 2008 conviction for battery, which he argues was inadmissible because the conviction was expunged under Penal Code section 1203.4.[3] Whether it was error to admit the conviction itself, we conclude defendant would not have received a more favorable result even if the conviction were excluded from evidence. (*People v. Callahan*, *supra*, 74 Cal.App.4th at p. 363; see Evid. Code, § 353, subd. (b).)

In addition to the evidence of Wendie's injuries, and her testimony regarding the attack, defendant's prior girlfriend, Jennifer, gave detailed testimony regarding defendant's assault on her in March 2008. Jennifer's testimony, to which defendant did not object, described a scene much like the one described by Wendie: defendant was drunk, he got angry with Jennifer, and he beat her. Presented with such evidence, combined with Wendie's testimony, the evidence of Wendie's injuries at the hospital, Deputy Goff's testimony, and the expert testimony of Detective Prizmich, we conclude it

---

[3] Defendant also contends the trial court erred in admitting Jennifer's testimony. At trial, however, defendant did not object to Jennifer's testimony, only the fact of the conviction. Accordingly, the issue is forfeited on appeal. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21.)

11

is not reasonably probable the defendant would have obtained a more favorable result had the court excluded his 2008 conviction from evidence.

## III

## DISPOSITION

The judgment is affirmed.


_____/s/_____
HOCH, J.


We concur:


_____/s/_____
RAYE, P. J.


_____/s/_____
DUARTE, J.