[No. A114585. First Dist., Div. Three. Dec. 19, 2006.]

In re DAVID MILLER on Habeas Corpus.

**COUNSEL**

Jennifer F. Jennings, under appointment by the Court of Appeal, for Defendant and Appellant David Miller.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Pamela Hooley and Patricia Webber Heim, Deputy Attorneys General, for Respondent Kathy Mendoza-Powers.

Opinion

**PARRILLI, J.**—In this case, the Board of Parole Hearings (Board), in revoking parole, relied on unsworn hearsay statements without determining either the unavailability of the declarant or the reliability of the hearsay evidence. The Board also did not determine whether good cause existed to admit the hearsay by weighing factors favoring admitting the hearsay statements against petitioner's right of confrontation. We conclude the Board was not entitled to rely on the hearsay evidence in revoking parole and we remand for a new hearing.

## FACTUAL BACKGROUND

### A. *Evidence Regarding the Alleged Offense.*

Petitioner David Miller was found guilty of second degree burglary and defrauding an innkeeper and sentenced to 16 months in prison. Shortly after his release on parole, petitioner was charged with various parole violations, including forced oral copulation and sexual battery.[1] Although no criminal charges for these offenses were filed, after a parole revocation hearing on February 14, 2006, a Board of Parole Hearings deputy commissioner (Commissioner) revoked petitioner's parole, returning him to prison for 12 months.

At the revocation hearing two witnesses, Detective Eddinger and Officer Norton, both of the Twin City Police Department, testified about the alleged parole violation based on their investigations; petitioner also testified. The victim did not testify; she was not subpoenaed for the hearing.

Detective Eddinger testified that on January 11, 2006, after receiving a call from Officer Norton regarding a reported sexual assault, he interviewed the victim. The victim related that she met petitioner through a telephone dating network and he arranged for a limousine to transport her to his hotel on the evening of January 10, 2006. Before she arrived they discussed various sexual matters over the phone, including a scenario where she would be abused by three men. The victim also stated that while she was talking to petitioner on the phone in the limousine, he directed her to do "weird stuff" such as exposing herself to the driver. She, nonetheless, went to petitioner's hotel room and he instructed her to remove her clothes, which she only did after he yelled at her. Over the next hour and one-half, petitioner touched the victim sexually and slapped her. A couple of times he grabbed her by the back of the hair and pushed her face into his crotch, forcing her to perform

---

[1] Charges of false imprisonment, penetration with a foreign object and illegal credit card use were all dismissed and are, thus, not relevant to this petition.

oral sex. Ultimately, she was able to leave the room and called a friend to pick her up. After returning home, she realized she had left her cell phone at the hotel and she attempted to reach petitioner to retrieve her phone.[2] He returned her call, but as of the time she called the police he had not returned the cell phone. She reported the incident to the police the next evening, initially merely for the purpose of retrieving the cell phone. After her interview with Detective Eddinger, however, she had a medical examination by a hospital sexual assault team.

The detective also interviewed petitioner, who denied any wrongdoing. He claimed the alleged victim arrived at the hotel with luggage, but was crying because she was having problems with her parents and that, after some time, he told her to leave.

The detective also testified that although the victim told him she was screaming and crying, no employees or neighbors heard her.

Officer Norton testified that on January 11 at approximately 6:25 p.m. he was notified of a possible rape.[3] He called and spoke to the alleged victim. His testimony essentially corroborated Detective Eddinger's, but provided some additional details. The victim told him that after she went to petitioner's hotel room and took her clothes off, he began to spank her. She offered neither physical nor verbal resistance, although she cried the entire time. Finally, petitioner told her to take a shower. When she finished showering, he forced her to orally copulate him. Again, she offered no resistance, other than crying. This continued over a period of hours. Several times, while she was crying, petitioner told her, "If you want to leave, leave," but when she attempted to, he would force her to perform oral sex on him. Later, petitioner tied the victim's two hands together and instructed her to get on all fours. In the middle of this activity, however, petitioner attempted to make several phone calls, inviting unidentified third parties to his hotel room. During this interlude the victim got dressed and started to leave. Again, grabbing her hair, he forced her head to his crotch. This time, however, the victim pulled her head away, whereupon petitioner let her go, telling her to take her things. She left.

Subsequently, Officer Norton confirmed with the hotel front desk employee that that employee had seen petitioner at approximately 12:30 a.m. with a

---

[2] At oral argument the Attorney General maintained that, based on the victim's written statement, the victim realized she had left her cell phone in petitioner's hotel room when she had to use the hotel phone to call her friend. Nonetheless, the testimony at the revocation hearing was, "She used a lobby phone yeah [to call her friend]. And then once she got home, she realized she left her cell phone at the hotel."

[3] The record does not disclose how or by whom he was notified.

White female, that they headed towards petitioner's hotel room, and that the woman left about 4:30 a.m., after waiting for her ride. Furthermore, housekeeping reported finding towels tied together, apparently in petitioner's room.

Petitioner also testified, relating a radically different story. He confirmed that he and the victim met through a telephone chat line and he invited her to his room. He paid for the limousine in which she arrived. When she arrived, she was upset and crying due to family problems; he was upset about the cost of the limousine. She then went to take a bath and he watched television. When she emerged naked from the bath, she made sexual advances towards him, which he rejected, feeling no attraction towards her. This upset her further and she began to spank herself. After eating some snacks and continuing to spurn the victim's sexual advances, petitioner asked her to leave. He emphasized that she had been free to leave at any time. Upset with his rejection of her, the victim asked for money. He had no money to give her, but offered her tickets for public transportation. Finally, after petitioner threatened to call the front desk, she left. Approximately an hour later she called him, seeking to retrieve her cell phone. Initially, petitioner was unable to find it, but located it in the parking lot about one hour later. He then called the phone number on the telephone and retrieved a message saying that she had lost her phone and providing a telephone number to call, which he did. Petitioner asserted that any injuries the victim sustained as of the time they parted company were self-inflicted.

### B. *The Revocation Hearing and Procedural History.*

In response to the parole agent's offer of hearsay testimony, petitioner's attorney objected, citing *U.S. v. Comito* (9th Cir. 1999) 177 F.3d 1166, and requested a dismissal of the charges. At the hearing, perhaps due to the commissioner's immediate ruling on the issue, there was no response by the parole agent prosecuting the revocation to petitioner's request for a dismissal. In denying the request for a dismissal the commissioner stated, "She['s] a confidential, she['s] a confidential witness given, given the nature of the charges. And I believe there is a basis under [*Comito*] for allowing the hearsay evidence based on that. So I'm not [dis]missing any of the sexual charges." The commissioner did not weigh the reasons to allow the hearsay testimony versus the rights of petitioner to confront his accuser. Indeed, other than the commissioner's conclusion quoted here, the record contains no explanation or discussion in support of this ruling.

The commissioner also reviewed a medical report by a nurse or doctor who examined the victim. The commissioner's summary of the report is limited to briefly describing the physical injuries observed by the examiner. A review of

the report itself also documents what the victim presumably said about how she sustained her injuries. For example, after indicating that the patient orally copulated the assailant, it states, "he forced her."

The commissioner found good cause to revoke petitioner's parole on the oral copulation charge "based on officer testimony that the victim was sexually assaulted by [petitioner]." He also found support for the sexual battery charge "based on the nature of victim[']s injuries and testimony of officer." At the hearing the commissioner stated, "I'm going to [make] a good cause finding on the sexual battery, based on the evidence and the reports and officers' testimony related to injuries sustained by the victim." Petitioner's attorney argued that since the commissioner was relying in part on the evidence of the victim's injuries to support the sexual battery charge, he should dismiss the oral copulation charge because that claim lacked any corroboration. The commissioner then stated that he was also basing that ruling on his finding that petitioner was not credible when he described the victim as the sexual aggressor. He weighed that against the victim's "testimony that [petitioner] forced her" over a period of time.

It is undisputed that at the time of the hearing, petitioner knew the victim's name, address, and telephone number. It is also true that, when the victim was given a written warning that her name, address and age would become a matter of public record and subject to release pursuant to section 6254 of the Government Code[4] unless she requested confidentiality, the victim requested confidentiality, except as necessary for her to receive certain support services.

On April 14, 2006, petitioner filed a petition for writ of habeas corpus in the Marin County Superior Court, which was denied on June 16, 2006, because "no objection was made at the hearing by petitioner or his counsel as to any hearsay statements," and because, "[i]n any event, to the extent that hearsay was presented over petitioner's objection, California law permits hearsay evidence at parole hearings."[5] This petition was filed on July 24, 2006, and after informal briefing was received, we issued an order to show cause on September 21, 2006, and set the matter for oral argument.

## DISCUSSION

Parole may only be revoked for cause. (Pen. Code, § 3063.) At a parole revocation hearing proof of the alleged parole violation must meet the

---

[4] This code section is part of the California Public Records Act (Gov. Code, § 6250 et seq.) and recites various categories of records that are exempt from disclosure in response to a request under that act.

[5] In these proceedings, the Attorney General concedes that a sufficient objection was made at the hearing. Thus, the sole issue before this court is whether the Board's reliance on hearsay evidence was proper.

preponderance of the evidence standard. (Cal. Code Regs., tit. 15, § 4982, subd. (d).) " 'As long as hearsay testimony bears a substantial degree of trustworthiness it may legitimately be used at a probation revocation proceeding. . . . In general, the court will find hearsay evidence trustworthy when there are sufficient "indicia of reliability." . . . Such a determination rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.' " (*People v. O'Connell* (2003) 107 Cal.App.4th 1062, 1066 [132 Cal.Rptr.2d 665], citations omitted, quoting *People v. Brown* (1989) 215 Cal.App.3d 452, 454–455 [263 Cal.Rptr. 391].) Parole revocation and probation revocation after the imposition of a sentence are constitutionally indistinguishable. (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 782, fn. 3 [36 L.Ed.2d 656, 93 S.Ct. 1756].)

### A. *The Alleged Victim Was Not a Confidential Witness.*

As indicated, at the hearing the parole agent never gave a reason to explain the victim's absence from the hearing or to justify the use of hearsay testimony. In his informal opposition to the petition, the Attorney General suggests that the reason the victim was not subpoenaed was because she qualified as a "fearful witness" pursuant to the Board's directive. Petitioner, however, correctly points out that even if the victim qualified as a fearful witness, she would not be excused from testifying. In the return, the Attorney General then abandons that argument and claims the victim is a confidential witness (which, if true, could excuse her from testifying). The Attorney General concedes that the governing Board directive defines a confidential witness as a "person whose identity is not known to the parolee and whose status as a confidential witness has been established by a law enforcement agency or by an agent of the Division of Adult Parole Operations." The Attorney General argues in his return that petitioner failed to prove that the victim's identity was known to him. With his traverse, however, petitioner files two exhibits—(1) the victim's unredacted, handwritten statement showing her name several times and (2) a copy of a restraining order, showing her name, address, and telephone number. A sworn declaration by the attorney who represented petitioner at the hearing states that one of the testifying police officers gave her the witness statement before the hearing. We also note that the hospital record relied on by the commissioner also contains the unredacted victim's name. Thus there is no dispute that the victim's identity had been disclosed at least by the time of the hearing. Therefore, under the Board's own policies, the victim cannot qualify as a confidential witness.

The Attorney General contends that because the victim requested her records not be disclosed in response to a Public Records Act request, she should be treated as a confidential witness. He provides no legal support for

the proposition that because an individual makes such a request, she should be excused from testifying and hearsay testimony relating her story should be allowed. This argument also ignores the definition of a confidential witness which requires that the individual's "status as a confidential witness has been established by [a] law enforcement agency or by an agent of the Division of Adult Parole Operations." The record before us contains no indication of any such determination having been made.

Moreover, the Board directive indicates, "In order for a witness to be appropriately deemed confidential, it must be determined that the safety of a person or an institution would be jeopardized if the confidential witness's status was known to the parolee." Here, there is no indication that any consideration for the victim's safety was the basis for the determination that she is a confidential witness. The commissioner's sole comment about why he considered the victim's identity to be confidential merely references the "nature of the charges."

For multiple reasons, the victim was not properly deemed to be a confidential witness.

B. *Under the* Comito *Balancing Test, Petitioner's Right to Confront His Accuser Exceeded the "Good Cause" Shown to Allow Hearsay Testimony.*

Even if the victim qualified as a confidential witness, the Commissioner would still have to consider whether the proffered hearsay evidence should be admitted. The United States Supreme Court has held that at a parole revocation hearing a parolee has a constitutional right "to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 489 [33 L.Ed.2d 484, 92 S.Ct. 2593].) If the hearing officer determines the potential witness would be subject to a risk of harm if his identity were disclosed, the parolee's right to confront the adverse witness can be abridged. (*Id.* at p. 487.) The Ninth Circuit, in *U.S. v. Comito, supra,* 177 F.3d 1166, 1171, set out a balancing test weighing the parolee's confrontation right versus the good cause the government must show to excuse the confrontation. The balancing test hinges on the importance of the hearsay evidence to the finder of fact's ultimate finding and the nature of the facts to be proven by the hearsay evidence. As the significance of the evidence to the ultimate finding increases, so does the importance of the parolee's confrontation right. Similarly, "the more subject to question the accuracy and reliability of the proffered evidence, the greater the releasee's interest in testing it by exercising his right to confrontation." (*Ibid.*)

Prior to the *Comito* decision the California Supreme Court, in a parole revocation case dealing with the use of prior testimony, adopted a nearly identical standard. "[I]n determining the admissibility of the evidence on a case-by-case basis, the showing of good cause that has been made must be considered together with other circumstances relevant to the issue, including the purpose for which the evidence is offered (e.g., as substantive evidence of an alleged probation violation, rather than, for example, simply a reference to the defendant's character); the significance of the particular evidence to a factual determination relevant to a finding of violation of probation; and whether other admissible evidence, including, for example, any admissions made by the probationer, corroborates the former testimony, or whether instead the former testimony constitutes the sole evidence establishing a violation of probation." (*People v. Arreola* (1994) 7 Cal.4th 1144, 1160 [31 Cal.Rptr.2d 631, 875 P.2d 736].) However, in a stipulated order for permanent injunctive relief in *Valdivia v. Davis* (E.D.Cal. 2002) 206 F.Supp.2d 1068, the State of California agreed to develop parole policies and procedures which, inter alia, limit the use of hearsay evidence as set forth in *U.S. v. Comito, supra,* 177 F.3d 1166. Thus, *Comito* analysis applies here.

The Attorney General argues that when hearsay evidence is deemed reliable, its admission is harmless error. Relying on *People v. Maki* (1985) 39 Cal.3d 707, 715 [217 Cal.Rptr. 676, 704 P.2d 743] a pre-*Comito* case, he argues that "where hearsay bears a substantial guarantee of trustworthiness, the flexible revocation proceeding allows its use." The issue in *Maki* was whether a defendant whose probation had been revoked had impermissibly left the geographical area to which he had been restricted. In addition to the probation officer's testimony that he had not given Maki permission to go to Chicago, the evidence offered by the prosecution consisted of a car rental receipt, bearing "the uncontroverted presence of defendant's signatures on the invoice," showing that he had rented a vehicle at O'Hare Field, Chicago, Illinois on January 27, 1983 (*id.* at pp. 716–717), and a customer receipt from the O'Hare Hyatt Regency showing that a certain sum was received from the defendant on January 28, 1983. There was also a factual finding that the signature on the car rental agreement was that of the defendant, who had signed two probation reports which were admitted into evidence. (*Id.* at p. 709.) Although the Supreme Court found this case to be "a close one" (*id.* at p. 716), the identification of the defendant's signature on the printed invoice and the fact that it was "an invoice of the type relied upon by parties for billing and payment of money" (*id.* at p. 717), was enough for the court to deem it reliable and affirm the probation revocation.

The Attorney General also cited *U.S. v. Walker* (9th Cir. 1997) 117 F.3d 417 to support the principle that hearsay evidence is admissible under certain circumstances. *Walker* dealt with the revocation of a defendant's supervised release in which the judge permitted a substitute agent to testify, based on the

case file, as to the defendant's release date. (*Walker*, at p. 419.) Walker did not dispute the substance of the testimony. *Walker* provides no support for the admissibility of the disputed hearsay evidence in this case.

The evidence the Attorney General marshals to corroborate the officers' retelling of the victim's story is of two kinds: hearsay statements of third party witnesses which Officer Norton relates, and the medical report. As discussed below, neither is adequate to justify the use of the hearsay testimony instead of the victim's own testimony.

### 1. *Out-of-court, Unsworn Statements by Potential Witnesses.*

The Attorney General focuses on Officer Norton's double-hearsay testimony that the front desk employee told him that the victim related to her petitioner tied her up and pushed her around.[6] He also testified that a cleaning person found towels tied together, presumably in petitioner's room. In other words, the parole agent proffers as corroborating evidence third parties' unsworn verbal statements, precisely the type of evidence *Comito* characterizes as "the least reliable type of hearsay." (*U.S. v. Comito, supra*, 177 F.3d at p. 1171.) In addition, the Attorney General invites us to use one portion of Officer Norton's testimony, based entirely on this unreliable hearsay, to corroborate a second portion his testimony, also based on hearsay. Rather than providing a strong indication of the reliability of the hearsay testimony, adopting such a criterion would eviscerate the need to provide indicia of reliability before hearsay evidence is received. Were this standard adopted, unreliable hearsay evidence could become reliable simply by attributing the evidence to several sources.

Furthermore, in *People v. Maki, supra*, 39 Cal.3d 707 there were two separate documents—a car rental receipt, corroborated by a hotel invoice. The fact that these independent business documents both tended to show that the defendant was in Chicago at the same time provided indicia of reliability of the documentary evidence supporting that conclusion. In contrast, here the stories of the three witnesses—the victim, the desk clerk, and the cleaning person—are not independent in that they are all being offered through the testimony of the same testifying witness, Officer Norton. The fact that Detective Eddinger's hearsay account partially corroborates Officer Norton's does not significantly alter the analysis since both witnesses' testimonies

---

[6] In fact, at the hearing the officer actually testified that the front desk employee stated that she saw a White woman with petitioner about 12:30 a.m., they headed towards petitioner's room, and about 4:30 a.m. the woman waited for her ride to show up. The written police report, however, indicates that the hotel clerk stated that the victim told her that petitioner tied her up and threw her around on the bed. It appears from the questions asked by the commissioner that he also had copies of the report.

merely recount a version of events attributed to the victim. To put it more simply: Reliability of a victim's hearsay statements is not established merely from the fact that the statements were made to multiple law enforcement officers.

 *People v. Maki, supra,* 39 Cal.3d 707 dealt with the use of hearsay documents to support a probation revocation decision. The California Supreme Court has unanimously rejected an attempt to extend *Maki* to allow for the introduction of hearsay based on out-of-court *verbal* statements, rather than documentary evidence. (*People v. Arreola, supra,* 7 Cal.4th 1144.) "Generally, the witness's demeanor is not a significant factor in evaluating foundational testimony relating to the admission of evidence such as laboratory reports, invoices, or receipts, where often the purpose of this testimony simply is to authenticate the documentary material, and where the author, signator[y], or custodian of the document ordinarily would be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action." (*Id.* at p. 1157.) In contrast, "the need for confrontation is particularly important where the evidence is testimonial, because of the opportunity for observation of the witness's demeanor." (*Ibid.*) Here, where there are numerous questions raised by the evidence, the witness's demeanor is only one of the important factors that escapes evaluation by the finder of fact who relies on this hearsay testimony. After meeting petitioner through a telephone network, the victim agreed to visit him in his hotel in the middle of the night. Over the phone she discussed explicitly sexual matters with him and he directed her to do "weird stuff" such as exposing herself to the limousine driver. Nonetheless, she voluntarily went to his hotel room and remained there, engaging in various sexual activities without resisting or seriously attempting to leave. Based on the hotel clerk's statements, there is some possibility the victim believed petitioner would pay her. The victim waited a substantial period of time before contacting the police and when she did so, her purpose was to retrieve a cell phone not to report a sexual assault. Simply put, this evidence raises credibility questions concerning both the victim's statements and what the victim may have consented to, which petitioner was entitled to pursue on cross-examination. By allowing hearsay testimony instead of the victim's testimony, petitioner was deprived of his right to confront the witness on critical testimonial evidence used to revoke his parole. The hearsay had virtually no indicia of reliability.

### 2. *The Hospital Record.*

The Attorney General also points to the hospital report as an indication of the reliability of the victim's hearsay testimony. We note preliminarily that the transcript lacks the standard foundational testimony that would qualify the

hospital report as a business record. There is also no custodian of records certification attached to the document. (Evid. Code, § 1561.)[7]

The report indicates the victim arrived at the hospital at 3:00 a.m. on January 12, 2006, and was discharged three hours later. The victim arrived at the hotel at approximately 1:00 a.m. on January 11, 2006—roughly one day before the medical examination. There is no evidence regarding what the victim did in the intervening time. Furthermore, the medical examination had been arranged by the police, who drove her to the examination. The statements recorded by the medical examiner reflect inconsistencies between what the victim apparently told him/her and what she told the police. For example, the medical report indicates that she was "tied down." The police testimony suggests that her hands were tied together, but does not suggest she was tied down. The medical report suggests that petitioner controlled the victim, in part, by threatening to bring other people into the room. Although the police testimony refers to petitioner's attempts to invite others to the room, there is no indication his purpose was to force her to remain in the hotel room, rather than to invite them to "come over," to participate in the ongoing activities. Finally, the medical report indicates that the victim knew petitioner through the Internet, while the police testimony is that the victim and petitioner became acquainted with one another through a telephone chat line. Thus, there are numerous discrepancies between the medical report and the officers' testimony. Even if the statements in the hospital report and the statements to the police had been consistent, it would not have been remarkable, for the medical examination was a part of the police investigation. Consistency in itself does not establish the statements are reliable.

There are two ultimate sources of information reflected in the medical report: the examiner's direct observations, for example, of bruises on the victim's body and the examiner's abbreviated summary of statements attributed to the victim. The fact that a medical professional, conducting an examination, observes certain objective facts and records them in a medical record, when properly presented to a trier of fact, may normally have sufficient indicia of reliability to establish those facts as true in a parole revocation hearing. That does not mean that the hearsay statements of the victim, also recorded in that same medical report, have the same degree of reliability as the examiner's direct observations. The victim's out-of-court statements summarized by the medical examiner are just another example of

---

[7] We recognize that strict compliance with the Evidence Code is not required at parole revocation hearings. *Pope v. Superior Court* (1970) 9 Cal.App.3d 636, 641 [88 Cal.Rptr. 483]. Nonetheless, as discussed above, at parole hearings hearsay is only admissible when it has sufficient indicia of reliability to be deemed trustworthy. In general, the laying of a foundation to establish that a document is a business record or having it be produced with an accompanying declaration from a custodian of records would tend to increase a document's apparent trustworthiness.

the type of hearsay *Comito* dubs the "least reliable" sort. Thus, the medical report lacks sufficient independent indicia of reliability to justify the Board's reliance on it to prove petitioner's culpability for the victim's injuries.

### 3. *Petitioner's Testimony.*

Petitioner testified that the bruises on the victim's buttocks were self-inflicted and that he saw no bruises on her breasts. Although the commissioner could properly have found this testimony unbelievable, there is nothing in the record, other than the hearsay testimony, to establish that petitioner committed the acts of which he was accused. Disbelieving petitioner's version of events is not sufficient to establish a parole violation, when there is no admissible evidence linking him to the victim's injuries.

### 4. *The Board's Failure to Weigh the Reasons to Allow the Hearsay Against Petitioner's Right to Confront Adverse Witnesses.*

The record lacks any assertion of the victim's unavailability. Nor is there anything to suggest the commissioner weighed the reasons the victim was absent against the need for cross-examination. The hearsay statements establish several potentially fruitful areas for cross-examination and were directly contradicted by petitioner's testimony. Given the absence of any evidence the prosecution attempted to compel the victim's testimony, and the lack of any justification for her absence, it is difficult to see how the commissioner could have concluded the balance weighed in favor of allowing the hearsay. There is also no justification for failing to undertake that analysis.

 This is a classic case which pits the victim's version of events against the petitioner's. The victim was not called as a witness, but based on her hearsay statements brought in through police officers, the commissioner credited the victim's description over petitioner's. By allowing the victim's rendition to be told by police officers, that rendition was both shielded from intense scrutiny and possibly imbued with added credibility. While it is possible that after hearing the victim testify and listening to her cross-examination, the hearing officer would have reached the same decision, eliminating that process deprived petitioner of an essential opportunity to confront his accuser and demonstrate why she should not be believed. Contrary to the Attorney General's suggestion, the hearing officer's failure to weigh the state's need for hearsay versus petitioner's right of confrontation cannot be considered harmless error since allowing petitioner to cross-examine the victim might well have affected the outcome of this case.

## DISPOSITION

We hold that petitioner was improperly denied his right to confront and cross-examine the adverse witnesses against him. Consequently, let an order

issue directing the Board of Parole Hearings either to promptly hold a new hearing consistent with this opinion or to release petitioner. (See *In re La Croix* (1974) 12 Cal.3d 146, 156 [115 Cal.Rptr. 344, 524 P.2d 816] [parolee whose right to a timely prerevocation hearing is denied is entitled to an order releasing him or an order to conduct a timely hearing].) All references to the parole violation based on the February 14, 2006 parole revocation hearing shall be stricken from petitioner's records.

McGuiness, P. J., and Pollak, J., concurred.

On January 17, 2007, the opinion was modified to read as printed above.