Filed 2/27/24  P. v. Herrera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARTHUR CHANCE HERRERA,<br><br>    Defendant and Appellant. | F085422, F085453, F085454,<br>F085455<br><br>(Super. Ct. Nos. RF008552A,<br>RF008777A, RF008785A,<br>RF008572A)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth G. Pritchard, Judge.

Jennifer Mouzis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, Ivan P. Marrs, Kari Ricci Mueller, and Edrina Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Hill, P. J., Levy, J. and Poochigian, J.

# INTRODUCTION

Appellant Arthur Chance Herrera contends on this appeal that his Fourteenth Amendment right to due process was violated when the trial court relied on inadmissible hearsay testimony to revoke his mandatory supervision in case Nos. RF008552 and RF008572 and violate his probation in case Nos. RF008777 and RF008785.[1] We agree, but conclude the error was harmless beyond a reasonable doubt and affirm the judgment.

# PROCEDURAL SUMMARY

## A.    Case No. RF008552

On November 19, 2020, the district attorney filed a complaint in case No. RF008552, charging that Herrera did willfully and unlawfully manufacture, cause to be manufactured, import into the state, keep for sale, give, lend or possess an instrument known as a billy, blackjack, sandbag, sandclub, sap or slungshot (Pen. Code, § 22210;[2] count 1); misdemeanor driving a vehicle with a suspended or revoked license due to a prior offense[3] (Veh. Code, § 14601.1, subds. (a), (b)(2); count 2); and three counts of misdemeanor failure to appear (§ 853.7; counts 3, 4, & 5).

On March 30, 2021, Herrera accepted a plea agreement to plead no contest to all counts and admitted the prior offense for driving on a suspended license in exchange for a three-year split sentence on count 1 as time served, with the remaining time on mandatory supervision and 180 days jail for counts 2 through 5 to run concurrent to his sentence in case No. RF008572.[4] Herrera also pled no contest to count 1, unlawful

---

[1]    On this court's own motion, we consolidated Herrera's appeals in the following cases:  RF008552 (case No. F085422), RF008777 (case No. F085453), RF008785 (case No. F085454), and RF008572 (case No. F085455).

[2]    Hereinafter, all undesignated statutory references are to the Penal Code.

[3]    The prior offense is from Kern County, case No. RM047033.

[4]    During this proceeding, Herrera also entered a no contest plea in case No. RF008572.

transportation of methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a)) and count 4, unlawful driving of a motor vehicle with a suspended or revoked license (Veh. Code, § 14601.1, subd. (a)) in case No. RF008572. Herrera admitted a violation of mandatory supervision in case Nos. RF008189 and BF176799.

On April 27, 2021, Herrera was sentenced in accordance with the terms of the plea agreement. In case No. RF008552, the trial court sentenced Herrera to the upper term of three years in county jail pursuant to section 1170, subdivision (h) for count 1. Herrera received credit for 53 days actually served, plus 52 days of conduct credit and the remaining time was ordered to be served on mandatory supervision. The court imposed various fines and fees, including a restitution fund fine of $300 (§ 1202.4, subd. (b)) and a $300 revocation of mandatory supervision fine (§ 1202.45), suspended. Herrera was ordered to "refrain from further violations of the law." As to counts 2 through 5, the court ordered appellant to serve a concurrent 180 days in county jail for each count.

**B.      Case No. RF008572**

On December 14, 2020, Herrera was charged with count 1, sale of a controlled substance, methamphetamine (Health & Saf. Code, § 11379, subd. (a)); count 2, possession for sale of methamphetamine (Health & Saf. Code, § 11378); count 3, possession of drug paraphernalia, a misdemeanor (Health & Saf. Code, § 11364); and count 4, misdemeanor driving on a suspended license (Veh. Code, § 14601.1, subd. (a)), with a prior offense on February 5, 2018, case No. RM047033, within the meaning of Vehicle Code section 14601.1, subdivision (b)(2).

On March 30, 2021, Herrera entered a no contest plea to counts 1 and 4 and admitted the prior offense under Vehicle Code section 14601.1, subdivision (b)(2).[5] Counts 2 and 3 were dismissed on the People's motion pursuant to section 1385.

_____

[5]      During this proceeding, appellant also entered a no contest plea in case No. RF008552.

3.

On April 27, 2021, pursuant to a stipulated plea agreement, the trial court imposed the upper term of four years on count 1, to be served pursuant to section 1170, subdivision (h)(5)(A), as a split sentence, with the first 104 days to be served in county jail. Herrera was granted credit for time served of 52 days actual credit and 52 days conduct credit, for a total of 104 days credit. The remaining time was to be served on mandatory supervision, concurrent with the term imposed in case No. RF008552. The court imposed various fines and fees, including a restitution fund fine of $300 (§ 1202.4, subd. (b)) and a $300 revocation of mandatory supervision fine (§ 1202.45), which was suspended. As to count 4, the court imposed 180 days county jail, to be served concurrent to count 1.

### C.     Case No. RF008777

On September 7, 2021, Herrera was charged in count 1 for manufacturing, importing, keeping for sale, or possessing any leaded cane, or any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot (§ 22210); in count 2, misdemeanor driving on a suspended license (Veh. Code, § 14601.1, subd. (a)), with three prior convictions for driving on a suspended license for purposes of Vehicle Code section 14601.1, subdivision (b)(2); and in count 3, misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).

On December 16, 2021, Herrera pled no contest to counts 1 and 2 pursuant to a plea agreement. In exchange, the People moved to dismiss all allegations as to count 2 and dismiss count 3 with a *Harvey*[6] waiver. On February 24, 2022, the court imposed one-third the middle term on count 1, to be served consecutive with case No. RF008785. The court stayed execution of the sentence and placed Herrera on probation for two years on condition of a 273-day county jail term with 273 total custody credits. For count 2, the court imposed a term of 180 days county jail, concurrent with count 1, with credit for

---

[6]     *People v. Harvey* (1979) 25 Cal.3d 754.

time served. The court also imposed various fines and fees, including a restitution fund fine of $300 (§ 1202.4, subd. (b)), and a $300 revocation of probation fine (§ 1202.44), suspended.

### D. Case No. RF008785

On September 20, 2021, Herrera was charged in count 1 with possession of 12-gauge shotgun ammunition by a felon (§ 30305, subd. (a)(1)); in count 3[7] with possession of a firearm, a zip gun, by a felon (§ 29800, subd. (a)(1)); in count 5, with manufacturing, importing, keeping for sale, or possessing a zip gun (§ 33600); and in count 7, with misdemeanor driving on a suspended license (Veh. Code, § 14601.1, subd. (a)), with two prior offenses on March 30, 2021, case No. RF008572, and on March 11, 2021, case No. RM053577, within the meaning of Vehicle Code section 14601.1, subdivision (b)(2). As to count 1, it was alleged that Herrera had been convicted of the following felony offenses: June 28, 2019, case No. BF176799, violation of section 4573.6; February 17, 2017, case No. FSB1304285, violation of section 2800.2, subdivision (a); and May 16, 2019, case No. RF008189, violation of section 21310.

On December 16, 2021, Herrera entered a no contest plea to counts 1, 3, 5, and 7, and admitted the Vehicle Code section 14601.1, subdivision (b)(2) prior offenses. On February 24, 2022, pursuant to a plea agreement, the court imposed the upper term of three years on count 1 and suspended execution of the sentence. Herrera was placed on probation for a period of two years, on condition of a 269-day county jail term, with total custody credits of 269 days. As to count 3, the court imposed one-third the midterm of eight months, to be served consecutive to count 1. The court suspended execution of the sentence and placed Herrera on probation for a period of two years, on condition of a 269-day county jail term, with total custody credits of 269 days. As to count 5, the court imposed one-third the midterm of eight months, to be served concurrent with the sentence

---

[7] Counts 2, 4 and 6 were charged against a codefendant.

5.

in count 3, with imposition of the sentence suspended. Herrera was placed on probation for a period of two years on condition of a 269-day county jail term, with total custody credits of 269 days. As to count 7, the court imposed a term of 180 days county jail, with credit for time served, concurrent with count 1. The court imposed various fees and fines, including a restitution fund fine of $300 (§ 1202.4, subd. (b)) and a $300 revocation of probation fine (§ 1202.44), suspended.

### E. Revocation Hearing

On July 25, 2022, the probation department filed a declaration letter in the superior court, stating that Herrera had violated the terms of his mandatory supervision in case Nos. RF008552 and RF008572, and violated the terms and conditions of his probation in case Nos. RF008777 and RF008785, by committing a new violation of law on May 25, 2022. In the declaration letter, the probation officer stated under penalty of perjury that Herrera was arrested on May 25, 2022, for new offenses of second degree burglary (§ 460, subd. (b)) and receiving stolen property (§ 496, subd. (a)). The probation officer requested that Herrera's mandatory supervision and probation be revoked.

On July 26, 2022, Herrera entered a denial to the violation in case Nos. RF008552, RF008572, RF08777, and RF008785.

On October 20, 2022, the trial court held a combined contested revocation hearing for case Nos. RF008777, RF008785, RF008552, and RF008572. The court found Herrera in violation of mandatory supervision in case Nos. RF008552 and RF008572, as well as in violation of probation in case Nos. RF008777 and RF008785.

On November 29, 2022, the trial court sentenced Herrera on the combined four cases. In case No. RF008785, probation was revoked and Herrera was sentenced to the middle term of two years state prison for count 1, and eight months, which is one-third the middle term, consecutive for counts 3 and 5, and the suspended probation

revocation fee of $300 pursuant to section 1202.44 was now imposed.  Herrera was awarded 529 days credit.

In case No. RF0080777, the trial court revoked probation and sentenced Herrera to one-third the middle term for eight months, consecutive to case No. RF008785.  The previously suspended probation revocation fee of $300, pursuant to section 1202.44, was now imposed.

In case No. RF008572, the sentence ordered on April 27, 2021, was set aside and mandatory supervision was revoked.  Herrera was ordered to serve the remainder of his middle term, three-year sentence in state prison, to be served concurrent to the sentence imposed in case No. RF008644A.  Herrera was awarded total custody credits of 909 days.  The previously suspended probation revocation fee of $300, pursuant to section 1202.44, was now imposed.

In case No. RF008552, the sentence ordered on April 27, 2021, was set aside and mandatory supervision was revoked.  Herrera was ordered to serve the remainder of his sentence in state prison for the middle term of two years, to be served concurrent with case No. RF08644A.  Herrera was awarded total custody credits of 912 days and the previously suspended probation revocation fee of $300, pursuant to section 1202.44, was now imposed.

## FACTUAL SUMMARY

Facts relating to the underlying offenses are not included in the record nor relevant to the issues raised in this appeal and, therefore, not included in this opinion.

## DISCUSSION

### I.     The Trial Court Erred by Admitting Inadmissible Hearsay at Herrera's Revocation Hearing Without a Finding of Good Cause, but the Error was Harmless Beyond a Reasonable Doubt.

Herrera contends that the trial court erred by allowing inadmissible hearsay testimony at his revocation hearing without making a finding of good cause.  He contends

7.

that the error is not harmless, arguing there is no evidence of a violation of law without the hearsay testimony. The People concede that the hearsay testimony was inadmissible and that there was no good cause finding made. However, the People contend the error was harmless beyond a reasonable doubt. We agree with the People that the court erred by admitting inadmissible testimonial hearsay without a finding of good cause but that the error was harmless beyond a reasonable doubt.

### A.     Relevant Factual and Procedural Background

At the revocation hearing, the People called Sergeant Bill Groves to testify regarding the allegations of burglary and receiving stolen property. Groves testified that on May 22, 2022, at approximately 9:00 a.m., he received a telephone call from another officer regarding a burglary to a red-tagged residence.[8] The officer reported to Groves that at approximately 1:45 a.m., there were several subjects who had made entry into a red-tagged vacant residence, which Groves and the police department had under surveillance. Defense counsel objected to this testimony as hearsay, but the court overruled the objection without comment.

Groves was provided photographs of the subjects who had entered the residence and he recognized Herrera as one of the individuals who was in the photographs. Based upon these photographs, Groves authored a *Ramey*[9] warrant for Herrera and several other individuals. Groves testified that on May 24, 2022, he executed a search warrant at Herrera's residence, and located several items belonging to the red-tagged residence. Defense counsel objected on foundation as to "where the property belonged." The court

---

[8]     A red-tagged residence is one that is deemed uninhabitable. (See *Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1147 [a residence is deemed "red tagged" if it has been declared not habitable, and any person occupying the building would not be in lawful residence]; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1093 ["red-tagged" property means unsafe for habitation].)

[9]     *People v. Ramey* (1976) 16 Cal.3d 263.

overruled the objection, explaining the testimony was foundational at this point, but noting counsel was welcome to renew the objection.

Groves related that the red-tagged residence belonged to a man named L.D., who died approximately two years earlier. The police department had been conducting surveillance on the red-tagged residence because there had been numerous thefts from the residence. In addition to physical surveillance, officers also placed cameras at the residence so they could monitor the comings and goings of people who were breaking into the residence. The photographs from the officer that Groves viewed were from those cameras. Groves explained that in the past, officers had been able to retrieve some items that were previously stolen and return them to the residence. Defense counsel objected to this testimony, arguing "[f]or these items to have been stolen, there's got to be an owner." Defense counsel asked who was claiming these items were stolen. The People indicated they were going to answer that question and the court overruled the objection, noting that the People were laying a long foundation. Groves testified that the deceased owner's brother, M.D., took care of the residence and was in charge of the estate and belongings. As such, M.D. was the victim in this case.

During the search of Herrera's residence, Groves and the other officers located a credit card in the name of L.D., a beer sign, and several bottles of alcohol, which were linked back to the residence, as well as numerous other items that other officers had seen at the residence prior to the theft in question. Defense counsel renewed his hearsay objection to the out-of-court statements by "other officers," noting that this was not a preliminary hearing and there was no exception to the hearsay rule. The trial court sustained this objection.

Groves explained that he had seen some of these items before in prior thefts from the red-tagged residence. Groves stated that the items had previously been identified to him as stolen. Defense counsel objected to hearsay based on who had identified the items to Groves, but the court said counsel was a step ahead because Groves had not said how

9.

the items were identified to him, and therefore did not rule. Groves explained that he had personally been inside the red-tagged residence and had seen these items there, and that they belonged in the residence. Defense counsel objected on foundation as to how Groves knew the items belonged in the residence. The trial court agreed there was no foundation as to how Groves knew where the items belonged.

Groves acknowledged that he did not personally speak with M.D. about whether anyone had permission to be in the residence on May 22, 2022, but "[o]ne of [the] other detectives" did, and said that no one had been given permission to enter or take property from the house. Defense counsel objected to the out-of-court statements from "other detectives," but the trial court overruled the objection, remarking, "I don't think that's true hearsay."

Groves stated that Herrera was arrested based on the items located at his place and with the *Ramey* warrant. After being taken into custody and waiving his *Miranda*[10] rights, Herrera provided a statement to Groves at the police department. Herrera first implicated K.W. for taking property like the sign from the red-tagged residence and bringing them to his place. Herrera said K.W. had stolen a motorcycle from the residence and that A.B.'s friend had taken the alcohol and given it to her. Groves showed Herrera a photograph of Herrera walking into the entrance of the red-tagged residence and told Herrera that he had a video of him going into the residence. Herrera admitted that it was he in the photograph and that he was on the property, but said he never went into the residence. After Groves showed Herrera the photographs of Herrera at the residence and of him carrying a box out of the residence, he asked Herrera, "You got caught, would you agree?" and Herrera responded, "yes, or yeah." Herrera admitted that all the property that the police found at his house was from the red-tagged residence and that any other property would be at K.W.'s trailer. Herrera further related that other people had also

---

**10**      *Miranda v. Arizona* (1966) 384 U.S. 436.

entered the residence and brought items taken from the red-tagged residence to his place because it was closest to the target house.

At the end of the evidence, the court stated, "I think that the areas where you were concerned about, are now moot. I don't think I have to even use that area. I think the later, it was just a foundation for the interview with the officer, everything in the interview I think is sufficient to support the finding of the violation of probation here, possessing stolen property or actually stealing stolen property."

Defense counsel responded that "in order for the property to be identified as stolen property, he would have to rely on hearsay from the person who owned it. If this property was sitting around in a house, a red-tagged house that was abandoned for some number of years, and the idea was that it was abandoned property. It was not theft. [¶] We haven't been able to identify an owner because there hasn't been an owner brought, and relying on the statements of the—whatever owner may have been assumed to be there, has to be done with hearsay. The only way that they can have that information is by the supposed owner's statements to the officer, and that owner wasn't brought. [¶] There's no way to identify that that property as being stolen property. There's no information from—usable information from any owner the, technically there's not any information that that was truly a trespass."

The People responded that they believed they had proven "at the very least, there was a trespass. By their own admission it was a red-tagged house that he was wandering in and out of taking property. So, we have to prove nothing more than the simplest of violations of any crime. So, he went into a red-tagged house. If we need to prove more I think we've proved abundantly more. At the very least, he went into a red-tagged house and was not supposed to be there. [¶] We have also heard by his own admission, that his house is where everyone brings all their stolen property. When they went to his house, even if that wasn't stolen, the other items were. We now, I think, have context to that. I don't think that's an issue."

11.

The People continued, "I think also the officer has been to that residence and seen items that belong inside that residence … I don't think there's an issue about abandoned property, as we know, there's an executor or someone who owns that residence. Even if it's [red-tagged] someone still owns it. Red-tagged just means you can't live there. Doesn't mean you don't own it. There's a distinction obviously. So just because it's [red-tagged], doesn't mean you still don't own the property there and the property inside. It doesn't mean people can come and just take from, which is obviously what happened. It's what he admitted to. I think we proved the trespass, the burglary, the theft and subsequent arrest all of that. [¶] If the [c]ourt wants to go down the rabbit hole and take [Herrera's] argument, we find at the very least a trespass, we have to find him in violation."

The trial court answered, "I don't think we have to go down any rabbit holes here. With all due respect, [defense counsel], I find the officer's testimony credible, that for whatever reason police, and this officer in particular were aware that items had been taken from that place by an unknown person, were put back in there, and then were taken [again]. Again, I think it establishes that the items were taken out of there without permission, after the police put them back in there."

The trial court further stated, "And then if we go solely by the interview done under *Miranda*, we have the acknowledgment of going into that place for trespassing, taking stuff out of the place, the acknowledgement that he was fishing with the officer to know what the officer knew about the matter, the comments about property being brought to his place as stolen property. So we have trespass, stolen property. [¶] I think the box itself would constitute a taking. But since we didn't get the details, I think I don't even have to rely on that to show that there's multiple crimes committed by the defendant in this matter, without having to get into the owner of the property in detail, as you're arguing.

12.

"So that's going to be the ruling. I'm going to find him in violation of both his mandatory supervision in those two cases, and in violation where he's on probation in [the] other two matters."

## B.      Standard of Review

We apply a de novo review where mixed questions of law and fact implicate constitutional rights. (*People v. Cromer* (2001) 24 Cal.4th 889, 894–904; *People v. Stanphill* (2009) 170 Cal.App.4th 61, 78, disapproved on other grounds in *People v. Gray* (2023) 15 Cal.5th 152, 173, fn. 8.) A violation of probation or mandatory supervision must be established by a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 441, 447 (*Rodriguez*).)

## C.      Applicable Law

A trial court may revoke probation or mandatory supervision "if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation or parole officer or otherwise that the person has violated any of the conditions of [his or her mandatory supervision]." (§ 1203.2, subd. (a).)

A probation or mandatory supervision revocation hearing is not a criminal trial but a hearing before a judge. (§ 1203.2, subd. (b).) "[T]he Sixth Amendment confrontation clause applies only to 'criminal prosecutions,' and a [probation or mandatory supervision] revocation hearing is not a 'criminal prosecution.' " (*People v. Stanphill*, *supra*, 170 Cal.App.4th at p. 72; *Rodriguez, supra*, 51 Cal.3d at pp. 441, 445, 447.) A defendant facing a mandatory supervision revocation hearing is entitled to " 'the minimum requirements of due process.' " (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 786; *Morrissey v. Brewer* (1972) 408 U.S. 471, 488–489; *People v. Arreola* (1994) 7 Cal.4th 1144, 1152 (*Arreola* ), superseded by statute on other grounds as stated in *In re Miller* (2006) 145 Cal.App.4th 1228, 1237; *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1198–1199, fn. 2 (*Shepherd*).) The supervised person has a

limited right to confront and cross-examine adverse witnesses, which stems from the due process clause of the Fourteenth Amendment, rather than the confrontation clause of the Sixth Amendment. (See *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411.)

### D. Analysis

Herrera argues that the trial court erred when it admitted testimonial hearsay evidence at the revocation hearing without any exception to the hearsay rule or a showing of good cause. One specific example was when the court allowed Groves to testify that some other unnamed detective told him that the victim of the burglary said no one had permission to be in the red-tagged residence. Herrera argues this hearsay testimony was relied upon by the court to find that Herrera's admissions supported a trespass and receiving stolen property in order to revoke his mandatory supervision and find a violation of probation.

"The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." (*Black v. Romano* (1985) 471 U.S. 606, 610.) "The fundamental role and responsibility of the hearing judge in a revocation proceeding is not to determine whether the probationer is guilty or innocent of a crime, but whether a violation of the terms of probation has occurred and, if so, whether it would be appropriate to allow the probationer to continue to retain his conditional liberty." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 348; *People v. McGavock* (1999) 69 Cal.App.4th 332, 337.) "[T]he process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." (*Morrisey v. Brewer*, *supra*, 408 U.S. at p. 489.)

In *People v. Maki* (1985) 39 Cal.3d 707, the court held that hearsay evidence may be used at a probation revocation hearing if it bears "a substantial guarantee of trustworthiness." (*Id*. at p. 715.) In *Maki*, the evidence of an invoice from a car rental

14.

company with the defendant's signature and a hotel receipt from out of the area, both of which were seized from the defendant's home, provided a sufficient basis for the court to revoke probation based on violation of the condition that the defendant not leave the area without permission.  (*Id*. at pp. 716–717.)

In *Arreola*, our Supreme Court addressed the admission of a preliminary hearing transcript at a revocation hearing, over the defendant's objections, in place of live testimony of a witness.  (*Arreola*, *supra*, 7 Cal.4th at pp. 1155–1156.)  It noted "[t]here is an evident distinction between a transcript of former live testimony and the type of traditional 'documentary' evidence involved in *Maki* that does not have, as its source, live testimony."  (*Id*. at p. 1157; see 2 Witkin, Cal. Evidence (3d ed.1986) § 901 et seq.).)  The need for confrontation is particularly important where the evidence is testimonial, because of the opportunity for observation of the witness's demeanor.  (*Arreola*, at p. 1157; *People v. Winson* (1981) 29 Cal.3d 711, 717.)  The court reaffirmed its holding in *Winson* that due process requires a showing of good cause for the admission of a preliminary hearing transcript, and held that "the probationer at a revocation hearing [is] 'entitled to cross-examine adverse witnesses, unless the hearing body specifically finds good cause for not allowing confrontation.' "  (*Arreola*, at pp. 1157–1158; see *Black v. Romano*, *supra*, 471 U.S. at p. 612.)

The *Arreola* court explained that the determination of whether former testimony is admissible must be made on a case-by-case basis.  (*Arreola*, *supra*, 7 Cal.4th at p. 1159; *People v. Winson*, *supra*, 29 Cal.3d at p. 719.)  And that the broad standard of good cause is met "(1) when the declarant is 'unavailable' under the traditional hearsay standard (see Evid. Code, § 240), (2) when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense, or (3) when the declarant's presence would pose a risk of harm (including, in appropriate circumstances, mental or emotional harm) to the declarant."  (*Arreola*, at p. 1160.)  "[T]he need for confrontation is particularly important where the evidence is testimonial, because of the

15.

opportunity for observation of the witness's demeanor." (*Id*. at p. 1157.) The good cause showing must be considered together with other relevant circumstances, including the purpose for which the evidence is offered, the significance of the evidence to the factual determination upon which the alleged probation violation is based, and whether other admissible evidence corroborated the evidence in question. (*Id*. at p. 1160.)

In *In re Miller* (2006) 145 Cal.App.4th 1228, the appellate court concluded that the petitioner was deprived of his right to confront the adverse witness on critical testimonial evidence used to revoke his parole. (*Id*. at pp. 1241–1242.) Officers testified regarding hearsay statements made by the victim at the parole revocation hearing. (*Id*. at p. 1238.) The court determined that the "evidence raise[d] credibility questions concerning both the victim's statements and what the victim may have consented to, which petitioner was entitled to pursue on cross-examination." (*Id*. at p. 1239.) Further, there was nothing in the record demonstrating that good cause was found for the victim's unavailability. (*Id*. at p. 1241.) And since the hearsay evidence had "virtually no indicia of reliability[,]" its admission could not be considered harmless. (*Id*. at pp. 1239, 1241; see *People v. Maki*, *supra*, 39 Cal.3d at p. 715.)

In *Shepherd*, the appellate court addressed a challenge to a witness's live testimony regarding a declarant's out-of-court statements at a probation revocation hearing. (*Shepherd*, *supra*, 151 Cal.App.4th at p. 1201.) The trial court permitted probation officer Timothy Giddings to testify regarding out-of-court statements made by a program administrator that appellant violated his probation by consuming alcohol. (*Id*. at p. 1202.) Although the issue pertained to live testimony rather than a declarant's prior recorded testimony, the court held that the good cause standard set forth in *Arreola* and *Winson* were applicable, rather than the more lenient standard set forth in *Maki*. (*Shepherd*, at p. 1202.) Because Giddings testified on behalf of the program administrator, appellant had no opportunity to cross-examine the program administrator and the court did not have the opportunity to observe her demeanor. Nor was any

justification offered for the program administrator's absence, such as why she was unavailable or that her live testimony could only be obtained at a great inconvenience. No other evidence corroborated the program administrator's statements that appellant smelled of and tested positive for alcohol consumption. (*Ibid.*) Additionally, it was unclear whether the program administrator herself made these observations or whether she was reporting what she was told by another unidentified person. (*Ibid.*) As such, the court concluded that since "no showing of good cause has been made for relying on Giddings's hearsay or double-hearsay testimony in lieu of live testimony[,]" the trial court erred in admitting the testimony at the hearing over appellant's objections. (*Ibid.*)

In considering the above cases, we conclude that Groves' hearsay statements about what other officers told him on behalf of the owner of the residence is testimonial hearsay, and a finding of good cause was required before admitting these statements. (See *Shepherd*, *supra*, 151 Cal.App.4th at pp. 1201–1202 [witness's live testimony of out-of-court statements is a form of testimonial hearsay and good cause standard applies]; *Arreola*, *supra*, 7 Cal.4th at pp. 1159, 1160 [a showing of good cause is required before admitting hearsay at a probation revocation hearing].) The hearsay statements here are like those in *Miller* and *Shepherd*, which also concerned live testimony regarding a witness's out-of-court statements. Here, the out-of-court statements are from another unnamed officer and include double hearsay from the owner of the property that no one had permission to enter the residence and take items. Like in *Miller* and *Shepherd*, Herrera was deprived of his right to confront adverse witnesses on critical testimonial evidence used to revoke his parole. (See *In re Miller*, *supra*, 145 Cal.App.4th at pp. 1241–1242; *Shepherd*, at p. 1202.) As such, the court should not have admitted the hearsay statements without requiring a showing of good cause. There is nothing in the record from the prosecutor demonstrating that the other officer and owner of the property were " 'unavailable' under the traditional hearsay standard," or that the witnesses "could only be brought to the hearing through great difficulty or expense," or that the witnesses'

"presence would pose a risk of harm … to the declarant." (See *Arreola*, at pp. 1159–1160.) Since there was no finding of good cause, the testimonial hearsay should not have been admitted over defense counsel's objections at the revocation hearing. (See *ibid*.)

The trial court's error in admitting the out-of-court statements is assessed for prejudice under the " 'harmless-beyond-a-reasonable-doubt' " standard, because the error is of federal constitutional dimension. (*Arreola*, *supra*, 7 Cal.4th at p. 1161; *In re La Croix* (1974) 12 Cal.3d 146, 154; *In re Edgerly* (1982) 131 Cal.App.3d 88, 93.) In *Arreola*, the court concluded the error in admitting the preliminary hearing transcript was harmless beyond a reasonable doubt where substantial evidence, independent of the hearsay transcript, established defendant had violated his probation. (*Arreola*, at pp. 1161–1162.) Here, as well, there is evidence in the record, independent of the hearsay testimony, showing that Herrera violated his probation and mandatory supervision. Surveillance photographs showed a group of people entering the red-tagged residence and Groves identified Herrera as one of those individuals. In Groves' interview of Herrera, Herrera admitted it was he in the photographs at the residence and carrying a box out of the house. Groves testified he had personally been to the red-tagged residence in the past and saw items that were found at Herrera's house that were previously inside the red-tagged residence.

We disagree with Herrera's claim that the property found in his home could not be considered "stolen property" without testimony from the owner that he had not given anyone permission to enter the home. Although Groves never personally spoke with the owner of the residence to determine whether anyone had permission to enter the residence, and there was no direct testimony from the victim that the items in Herrera's house were stolen, circumstantial evidence demonstrated that Herrera was not given permission to enter the residence and knew the items were stolen. Groves explained that he and his department had been conducting surveillance and hung cameras at the red-tagged residence because of the number of reported break-ins and thefts at the

18.

residence. Groves had been inside the red-tagged residence before and had seen the items in Herrera's house previously inside the red-tagged residence. One of the items located inside Herrera's house was a credit card with the name of the deceased owner of the red-tagged residence. The trial court stated it found Groves' testimony credible. Further, Herrera admitted to Groves that he knew K.W. had stolen a motorcycle from the red-tagged residence, essentially acknowledging he knew K.W. did not have permission to take the motorcycle. Herrera also admitted the alcohol found in his house had been taken from the red-tagged residence. After Groves showed Herrera the photographs of Herrera at the red-tagged residence and of him carrying a box out of the residence, Herrera admitted he had gone into the residence and that he got caught, and that all the property that the police found at his house was from that residence. On this record, and excluding the inadmissible hearsay, we conclude there is sufficient evidence by a preponderance of the evidence that Herrera violated the terms of his probation and mandatory supervision by trespassing at the red-tagged residence and received stolen property from that residence. (See *Rodriguez*, *supra*, 51 Cal.3d at p. 441; § 1203.2, subd. (a).)

## DISPOSITION

We affirm the judgment.